**WYNN OIL COMPANY, a California corporation, Plaintiff,**

v.

**AMERICAN WAY SERVICE CORPORATION, a Michigan corporation and Thomas A. Warmus, Defendants.**

**Civ. No. 89–CV–71777–DT.**

United States District Court, E.D. Michigan, S.D.

April 30, 1990.

---

William C. Potter, Jr., Detroit, Mich., for plaintiff.

Raymond L. Morrow, Troy, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, Wynn Oil Company (Wynn) has filed this action against Defendants American Way Service Corporation (American Way) and Thomas A. Warmus, its president, seeking both damages and the injunction of further infringement of Wynn's registered trademark, "X–TEND". Plaintiff alleges trademark infringement in violation of 15 U.S.C. § 1114, unfair competition in violation of 15 U.S.C. § 1125(a), unlawful trademark dilution and injury to business reputation, common law trademark infringement and unfair competition, and violation of the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.* The matter has been tried by the court without a jury, and this memorandum constitutes the findings of fact and conclusions of law of the court.

Wynn is a California corporation owned by Wynn's International, Inc. with its principal office in Fullerton, California. It manufactures automotive products including fuel and oil additives which are marketed through hardware, automotive supply, and mass market chain stores, service stations, garages and new and used car dealerships.

During the early 1970's, Wynn divided its additives into two distinct product lines. The first, an easy-to-use car care line, was designed for use by the hobbyist or economy-minded vehicle owner. This product line was intended for direct sale to the consumer for personal car care. It was marketed through manufacturer's representatives and a direct sales force to automotive supply outlets, discount chains, convenience, hardware, and drug stores and similar retailers. This product was sold under the registered trademark "Wynn's", which was registered on March 13, 1973. (U.S. Patent Office Trademark No. 954,-863).

The second product line was intended for use by professional auto mechanics who repair cars for their customers. This line, marketed through an extensive distributor network to car dealers, repair shops, service stations and national account chains, bore the registered trademark "Wynn's X–TEND". (U.S. Patent Office Trademark Nos. 821,881; 997,417; 1,482,081; 1,525,-053). X–TEND was first registered as a trademark on January 10, 1967 by X–TEND Automotive Industries, Inc. The trademark was assigned to Wynn on Octo-

ber 15, 1971. This product line continues to market its products under the X–TEND trademark. In the early 1970's, Wynn also began to market a product warranty program called "Wynn's X–TEND Guarantee". This program provides warranty protection for certain repair costs to new and used car purchasers provided they regularly used Wynn's X–TEND auto products in their cars. Customers buy a "product warranty kit" which warrants all internally lubricated parts. This extended guarantee program is available through new and used car dealers who also sell the X–TEND product line. The price range for the product warranty kits is from $120.00 to $550.00 at retail. Prices vary depending on the duration of the warranty, the scope of coverage and the type of kit purchased. In 1980, Wynn changed the name of this warranty program to "Wynn's Product Warranty".

Wynn does not itself advertise directly to the purchasing public. However, either the Wynn's distributor or the retailer who purchases Wynn's and X–TEND products provides direct advertising to the public. Wynn then reimburses its distributors and the retailers through a "co-op" advertising allowance. The distributors and retailers place advertisements in local newspapers and in trade journals such as *Motor Magazine, Motor Age* and *Service Station Management.* For the X–TEND product line, Wynn provides advertising materials to distributors and retailers for use at the point of sale. This includes counter cards intended to be placed in the service area, posters, banners, and display flags bearing X–TEND advertising, and promotional items such as thermos jugs, digital watches, picnic bags and pens, all intended to be given to those customers who buy X–TEND products from the retailer. The distributors also are given items intended for the retailer or repair shop and their employees. These include jackets, vests, sweatshirts, T-shirts, and hats, all of which prominently bear the X–TEND trademark. These items are worn by employees with whom the customer comes into contact.

In Michigan currently, there are over sixteen trucks and vans owned by distributors covered by the trademark "Wynn's X–TEND" on their exterior, and constantly on the roads making deliveries. Further, over one thousand "power flush" machines bearing the X–TEND mark have been placed in the service areas of various auto service establishments throughout Michigan.

American Way is a Michigan corporation with principal offices in Southfield, Michigan. Thomas A. Warmus is president and sole shareholder of the company. In 1980, American Way introduced an extended warranty program to new and used car dealers under which it would administer extended service contracts which the dealers would sell to customers buying new and used cars. This service contract reimburses the car buyer for covered repair costs incurred within the period of coverage and which are not otherwise covered by the manufacturer's warranty. These contracts, like Wynn's Product Warranty, cover repairs necessitated by the failure of internally lubricated parts. In administering these contracts, American Way deals exclusively with new car dealers, many of whom also sell used cars.

Beginning about 1985, American Way released brochures, forms, service contracts and other written literature describing its service contract program as "The American Way X–TEND". Before doing so, Mr. Warmus testified, neither of the Defendants conducted any search or investigation whatsoever to ascertain whether the term X–TEND was already in use or registered.

Wynn Oil first became aware of American Way's use of the term X–TEND about July, 1987 when it was first sent a brochure, but that brochure did not contain the address of American Way. It was not until January, 1989 that Wynn was able to ascertain American Way's location. On February 9, 1989, Wynn's counsel, Carl J. Kidwell, wrote to American Way informing it of the registration of the mark and demanding that it cease using the mark X–TEND. No response was ever received from that letter. Outside counsel for Wynn wrote a second demand on April 10,

1989, requesting that American Way cease and desist from using the X–TEND trademark. This letter also explained that unless Wynn or its attorney received some affirmative answer within twenty days, appropriate relief through the courts would be sought.

On April 21, 1989, Warmus responded by letter that X–TEND had been used by his company for nine years, and that if "your client or law firm are the type of people who like to go around and throw their muscle, then be my guest, I'll go to court and see if some judge agrees that our logo is any violation of your rights." Wynn filed the instant suit on June 5, 1989.

## I. TRADEMARK INFRINGEMENT

■ Wynn alleges that American Way's use of the term X–TEND constitutes trademark infringement in violation of 15 U.S.C. § 1114. The test for trademark infringement in this circuit is "whether the alleged infringement of a trade or service mark causes a 'likelihood of confusion' among consumers." *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir.1986).[1] "The general concept underlying likelihood of confusion is that the public believe that the mark's owner sponsored or otherwise approved of the use of the trademark." *Id.* at 1186. In *Frisch's Restaurants v. Elby's Big Boy, Inc.*, 670 F.2d 642 (6th Cir.1982), the court of appeals enumerated the factors to be considered in determining likelihood of confusion. They are:

1. The strength of the mark;
2. The relatedness of the goods;
3. The similarity of the marks;
4. Evidence of actual confusion;
5. Marketing channels used;
6. The likely degree of purchaser care;
7. The defendant's intent in selecting the mark;
8. The likelihood of expansion of the product lines.

*Id.* at 648. Wynn is not required to prove all, or even most, of these factors in order to prevail. *Wynn Oil, supra,* at 1186.

1. *Strength of the Mark.*

■ 15 U.S.C. § 1065 provides that a registered mark that is not successfully challenged within five years of registration becomes incontestable.[2] The trademark X–TEND was first registered in 1967 and has been owned by Wynn since 1971. American Way has acknowledged the incontestability of Wynn's trademark but maintains that X–TEND is merely a descriptive mark and may be challenged on that basis. However, the Supreme Court held in *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) that "an infringement action may not be defended on the grounds that a mark is merely descriptive, if that mark has met the requirements of incontestability." If registered for five years, a mark is considered strong and worthy of full protection. *Wynn Oil, supra,* at 1187. The Court therefore finds that X–TEND is an incontestable trademark, the strength of which cannot be challenged as merely descriptive.

2. *Relatedness of the Goods.*

A. Wynn's Automotive Products and American Way's Service Contract.

■ American Way maintains that there is little relatedness of the goods because it sells services with the X–TEND mark, whereas Wynn sells products with the mark. However, in *Wynn Oil, supra,* at 1187, the Court held that there was sufficient relatedness between defendant's car

---

1. 15 U.S.C. § 1114 provides in pertinent part: (1) Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or *in connection with which such use is likely to cause confusion* ... shall be liable in a civil action by the registrant.... (Emphasis added).

2. 15 U.S.C. § 1065 provides in part: [T]he right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable ... .

wash services and plaintiff's car care products to support a finding of likelihood of confusion. "While we agree that the relatedness diminishes between products and services, the two parties fundamentally are selling the same thing—a clean car." *Id.* at 1187. In the present case, there is a relatedness between American Way's X–TEND service contract and Wynn's X–TEND automotive oil and fuel additives, since both eliminate or diminish post-purchase car repair expenses for internally lubricated parts. Although the relationship between services and products here is not as strong as that in *Wynn Oil*, a consumer who has used or become aware of Wynn's X–TEND car care products could easily and reasonably conclude, on seeing Defendants' mark and product, that Wynn was now offering service contracts. Insofar as internally lubricated parts are concerned, both parties are selling an assurance against future costs.

B. Wynn's Product Warranty and American Way's Service Contract.

■ American Way argues that Wynn uses the trademark X–TEND solely in conjunction with its "professional" product line and no longer in conjunction with its warranty program. American Way argued in its brief and at trial that "[n]either the warranty program nor the kit of additives sold as part of the program involve the use of the term X–TEND." This, however, is not entirely true. Although since 1980, Wynn has called its guarantee "Wynn's Product Warranty" rather than "Wynn's X–TEND Guarantee," the X–TEND trademark has not been completely omitted from Wynn's advertisements of its warranty. In fact, the kits given to purchasers of the Wynn warranty contain warranty advertisements which include the X–TEND mark. American Way has adopted Wynn's mark and now competes against Wynn. American Way is therefore using Wynn's own name to its detriment.

There is clearly a high degree of relatedness between Wynn's product warranty and American Way's service contract. Both are designed to protect car buyers from automotive repair expenses for inter-

nally lubricated parts not covered by the manufacturer's warranty. American Way attempts to distinguish the two services on the ground that Wynn's warranty covers only internally lubricated parts whereas American Way's contract "could cover virtually the entire automobile" under available options. However, American Way's plan does include coverage of internally lubricated parts and the parties products clearly overlap at that point. The purchaser of defendant's "insurance" program does not need the more limited but similar protection which plaintiff offers. Therefore, there is direct competition between plaintiff's and defendant's services within this area of overlap. Although, as American Way asserts, Wynn is a party to its warranty contract whereas American Way is not a party to its service contracts, that fact does not bear upon the relatedness of the two services. Moreover, identity of products is not necessary to cause a likelihood of confusion among reasonable consumers. Confusion may concern sponsorship, as well as characteristics.

3. *Similarity of the Marks.*

■ "In evaluating similarity ... side-by-side comparison is not the test.... Instead, a court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented' ". *Wynn Oil, supra,* at 1187. (quoting *Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980) and *Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 941 (10th Cir.1983).) The *Wynn Oil* court went on to state that "[a] proper analysis of similarity includes examining the pronunciation, appearance, and verbal translation of conflicting marks." Here, both parties use the term X–TEND with identical spelling. The appearance of the two marks is similar enough that it would confuse customers "who do not have both marks before them but who may have a 'general, vague, or even hazy, impression or recollection' of the other party's mark." *Id.* Although Wynn sometimes superimposes its trademark on a checkered flag and defendant employs a different color scheme, this does

not suffice to distinguish the marks. Likewise, defendant's use of the words "the American Way" together with the mark does not dispel the implication that Wynn has approved of this use of its trademark.[3] American Way's contention that the two marks are dissimilar because Wynn's use is linked to a tangible product by the phrase "professional formula" while its own use is nearly always linked to a service contract is without merit.

#### 4. *Evidence of Actual Confusion.*

■ Wynn failed to show any evidence of actual confusion by individual customers. American Way correctly points out that evidence of actual confusion is the best evidence of the likelihood thereof. *Frisch's Restaurants, supra* at 648. However, the court in *Wynn Oil* held that the absence of such evidence is not significant:

> [T]his fact does not preclude this Court from concluding that there is a 'likelihood of confusion', as actual confusion is merely one factor to be considered.... Further, because evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial, this factor is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.

*Wynn Oil, supra,* at 1188 (quoting *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.,* 750 F.2d 903, 914 (Fed.Cir.1984). This is not a case in which the particular circumstances indicate that evidence of actual confusion should have been available and was not, nor is it one in which there is evidence of past confusion. Accordingly, the Court grants little weight to the fact that Wynn has not produced such evidence.

#### 5. *Marketing Channels Used.*

There is an obvious overlap in the marketing channels used by Wynn and American Way. Since 1971, Wynn has sold its X–TEND product line through an extensive distributor network to new and used car dealers, service stations, and other businesses which repair automobiles for the motoring public. American Way markets its service contract administration program to Michigan new car dealers only. There are fifteen dealerships in Michigan where both Wynn and American Way are selling under the X–TEND mark. Wynn has invested heavily in advertisements and promotions of the name X–TEND in those car dealerships for many years. American Way is now using that same name in competition against Wynn's warranty program. Although American Way has never advertised, it has routinely placed "X–TEND approved" placards on the windshields of used cars in numerous Michigan dealerships where all of Wynn's X–TEND banners, flags, posters and gifts are also displayed and given to customers. Wynn and American Way, therefore, market their products through a common marketing channel; Michigan auto dealerships.

#### 6. *Likely Degree of Purchaser Care.*

Generally, the less care that a purchaser takes in comparing products, the greater the likelihood of confusion. *Zin–Plas Corp. v. Plumbing Quality AGF. Co. Ltd.,* 622 F.Supp. 415 (W.D.Mich.1985). Here, the relevant class of consumers likely to be confused is not the professional purchasers who own and manage dealerships, but rather the car buying public. The average cost of American Way's service contract is approximately $250.00. This cost would make the degree of purchaser care higher than a casual or impulse purchase. As American Way contends, the care taken by a purchaser of a can of fuel or oil additive is probably much lower than that taken by the buyer of a service contract.

However, the price of American Way's service contract must be compared with that of Wynn's product warranty kits, which range from $75.00 to $450.00. Where the prices of competing products

---

**3.** See Callman, *The Law of Unfair Competition, Trademarks and Monopolies,* (4th Ed.1981), §§ 20.37 and 20.38: "The addition of the infringer's corporate name only serves to aggravate the confusion by suggesting that the infringer is a licensee or subsidiary of the plaintiff."

are comparable, the likelihood of confusion is greater. *Paramount Pictures Corp. v. Dorney Park Coaster Co.*, 698 F.Supp. 1274 (E.D.Pa.1988). It is irrelevant that the final price of Wynn's warranty is fixed by the car dealer rather than by Wynn. While it is difficult to determine the degree of care which a purchaser will exercise in actual practice, defendant's own president, Thomas A. Warmus, testified as to the care exercised by car buyers that: "[p]eople come in and its like they are on ether and they sign their names on a bunch of forms and ninety percent of the people never see them, never get them." It is noteworthy, therefore, that his merchandising efforts are predicated upon an ignorant and easily confused consumer.

### 7. Defendant's Intent in Selecting the Mark.

■ "Although wrongful intent is not an absolute requirement to a finding of likelihood of confusion, such an intent is strong evidence that confusion will result. Such an intent may be found by an employee's knowledge of a prior use of a particular mark." *Empire National Bank of Traverse City v. Empire of America*, 559 F.Supp. 650 (W.D.Mich.1983), citing *Koffler Stores Ltd. v. Shoppers Drug Mart, Inc.*, 434 F.Supp. 697 (E.D.Mich.1976), *aff'd*, 559 F.2d 1219 (6th Cir.1977).

■ The Court does not find credible defendant's testimony that he had no knowledge of the X–TEND trademark until he received notice from Wynn's attorney in 1989. Mr. Warmus's testimony emphasized his thirty years of extremely close, even familial relationships with all car dealers in Michigan and his intimate knowledge of all aspects of their business. He conducts training programs for their wives and staff and is the "featured host" at all of their meetings. Mr. Warmus further testified that he is familiar with all legal, banking and manufacturer's requirements in the auto sales business in Michigan and drafts his own contracts to achieve full compliance with such requirements. He attended law school. In spite of all this knowledge, however, he testified that he

could not recall any search as to the status of the mark X–TEND when he adopted it in 1985. He did not request that his staff conduct such a search, and testified that he had never seen the mark in use himself. This is despite the heavy coverage of this market by plaintiff's materials promoting the mark since 1980. Wynn's promotional activities include advertisements in numerous trade journals such as *Motor Magazine, Motor Age* and *Service Station Management,* point of sale advertisements such as counter cards, posters, banners and display flags, and promotional items provided to distributors to be given to members of the car buying public when they purchased X–TEND products and to sales and service personnel in the dealerships.

In addition, over sixteen trucks and vans traveling Michigan roads bear the trademark Wynn's X–TEND and over one thousand of Wynn's power flush machines bear the X–TEND trademark in various retail locations throughout the state. Moreover, whether or not defendant had actual notice of Wynn's use of the X–TEND mark, Wynn's prior registration of the mark constituted constructive notice of its claim of ownership. Registration "affords protection which is nationwide and not confined to areas of actual use of the mark." *Koffler Stores, supra.*

The Court also gives little weight to defendant Warmus's testimony as to why he did not simply abandon the mark, which he testified was useless to him in view of his strong personal relationships with dealers, when he received the letter from Wynn's attorney. Mr. Warmus stated that he "never had a chance" to cease using the mark. In actuality, he had responded to Wynn's cease and desist demand and promise to pursue legal remedies with an invitation to "be my guest".

Moreover, Warmus' contention that he had no chance to cease and desist is further belied by his testimony that he used service contracts only as an accommodation to dealers with whom he had personal relationships, at their request. He testified that he had never needed to advertise because his relationship with dealers was all

he needed to promote his extended service contracts among them. However, it is the *customer* who buys the warranty, and the dealer is simply being made an agent of Defendants in placing before the buyer papers entitled X–TEND, which suggest the endorsement of Plaintiff. The "X–TEND Approved" placards which he caused to be placed on cars in dealer lots are for the benefit of customers, not dealers. As Plaintiffs' counsel testified, this conduct places Plaintiff's reputation at risk for activities over which it has no control whatsoever, aside from the fact that Defendants' program competes directly against Plaintiff's own less extensive product warranty program.

In addition, Defendant Warmus' subsequent testimony that he spends as much as Three Million Dollars per year for promotional materials similar to Plaintiff's is not credible, as it was totally inconsistent with his prior testimony that he never needed to advertise his warranty program. It is noteworthy that not one promotional object was introduced by Defendants at trial. If they had been produced, however, they would likely suggest even more egregious infringement activity.

The Court concludes that Warmus obviously knew that Plaintiff's trademark was of value in attracting consumers to his service, that he intended to use the mark for that service and, even after receiving a cease and desist demand, to continue using Plaintiff's incontestible mark to his own benefit. His infringement was intentional, and his testimony to the contrary is not credible.

8. *Likelihood of Expansion of the Product Lines.*

■ The last factor to consider is the likelihood that either business will expand its product line to compete with the other. "Inasmuch as a trademark owner is afforded greater protection against competing goods, a 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of find-

ing that the present use is infringing." *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir.1979). Although Wynn's counsel testified that it is contemplating expansion into American Way's principal field of endeavor, the insurance business, it is unlikely that American Way will ever sell oil and fuel additives. Neither of these contingencies, however, is essential to a showing that there is a likelihood of direct competition between the two businesses. Here, this likelihood is already a reality since American Way's service contract directly competes with Wynn's product warranty in the area of internally lubricated parts. This competition markedly increases the likelihood of consumer confusion between the two products.

Taking into consideration all of the above factors, the Court finds that American Way's use of the trademark X–TEND causes a strong likelihood of confusion among consumers. Although there has been no showing of actual confusion in the past, other relevant factors weigh strongly in its favor. X–TEND is an incontestable trademark. Wynn registered the trademark, used it in commerce for several years and engaged in extensive advertising before American Way adopted it. American Way has used the mark with an identical spelling and a substantially similar appearance to market similar products through the same marketing channels in direct competition with Wynn. Also, to those consumers familiar with the X–TEND mark from Wynn products, its appearance on defendant's warranty will suggest the sponsorship of Wynn Oil. American Way has done this knowingly and with the intent to benefit from Wynn's labors. The Court therefore finds that the defendant's adoption of the X–TEND mark constitutes trademark infringement in violation of 15 U.S.C. § 1114.

## II.  UNFAIR COMPETITION

■ 15 U.S.C. § 1125(a) prohibits the use of any "false designation of origin", "misleading description" or "misleading representation."[4] The test for unfair com-

---

**4.** The statute provides: "Any person who, on or   in connection with any goods or services ...

petition under § 1125(a) is the same as that for trademark infringement under 15 U.S.C. § 1114, i.e. whether there is a likelihood of confusion. *Thompson Medical Company, Inc. v. Pfizer, Inc.*, 753 F.2d 208 (2nd Cir.1988); *Grey v. Campbell Soup Co.*, 650 F.Supp. 1166 (C.D.Cal.1986), *aff'd*, 830 F.2d 197 (9th Cir.1987). For the reasons set forth in the previous discussion, the Court finds that American Way has engaged in unfair competition in violation of 15 U.S.C. § 1125(a).

## III. COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION

Defendant relies upon *Marion Laboratories, Inc. v. Michigan Pharmacal Corp.*, 338 F.Supp. 762 (E.D.Mich.1972) in support of its argument that Wynn's common law claims are barred by its failure to prove that the X–TEND mark had acquired a secondary meaning. *Marion*, however, does not support Defendants' position. The court there relied upon two Supreme Court decisions in making its determination of the common law claims remaining to the plaintiff: *Sears, Roebuck & Co. v. Stiffel Company*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1961) and *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). These cases are clearly distinguishable from the case at bar as each dealt with the unauthorized duplication of a physical aspect of an unpatented product rather than with infringement of a duly registered trademark.

Neither of these cases stands for the proposition that the owner of a registered trademark must show evidence of a secondary meaning in order to maintain a common law claim for trademark infringement.

In its reliance on *Sears* and *Compco*, the *Marion* court recognized explicitly that a common law action for trademark infringement may be maintained:

> [A] state ... may require goods to be labeled or that other precautionary steps be taken to prevent customers from being misled as to the source of goods; and ... it *may also protect the use of trademarks*, labels or distinctive dress in packaging *to prevent the public from being misled.*

*Marion, supra,* quoting *Sears, supra.* (Emphasis added). Likewise, *Compco* held only that when a product is unprotected by patent or copyright, state law may not forbid others to copy that product. Further, the court in *Marion* recognized the existence of a claim for unfair competition under Michigan common law.[5]

"To establish infringement of a registered trademark it need only be shown that an infringer used a reproduction, copy or colorable imitation of the registered mark in a way 'likely to cause confusion or mistake or to deceive purchasers as to the source of origin or such goods.' " *EMRA Corp. v. Superclips Ltd.*, 559 F.Supp. 705 (E.D.Mich.1983), citing 15 U.S.C. § 1114(1); *Statler Manufacturing Co. v. Geo. C. Knight Co.*, 228 F.2d 136, 139 (6th Cir. 1955). Factors to consider in a common

---

uses in commerce any word, term, name, symbol, or device ... or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which —(1) is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

**5.** "Decisions of Michigan courts ... state the Michigan law of unfair competition as follows. 'Unfair competition ordinarily consists in the simulation by one person, for the purpose of deceiving the public, of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares of one person

for those of another, thus falsely inducing the purchase of his wares and thereby obtaining for himself the benefits properly belonging to his competitor. The rule is generally recognized that no one shall by imitation or unfair device induce the public to believe that the goods he offers for sale are the goods of another, and thereby appropriate to himself the value of the reputation which the other has acquired for his own product or merchandise.' ... The State of Michigan has expressed, through its decisional and statutory law, that packaging must not mislead the customer. Thus, this court finds that plaintiff has alleged a claim that remains cognizable under existing Michigan law or unfair competition despite the *Sears* and *Compco* decisions." *Marion Laboratories, supra,* at 767–768. (Citations omitted).

law claim of trademark infringement and unfair competition include the likelihood of confusion among the public and the strength and value of the individual uses as trademarks. *Koffler Stores, Ltd., supra,* at 703. In sum, the factors to consider in a common law claim are included in those already considered by this Court under the statutory counts of trademark infringement and unfair competition. Therefore, for the reasons set forth in Part I of this opinion, the Court finds for the plaintiff on this count.

## IV. TRADEMARK DILUTION and INJURY TO BUSINESS REPUTATION

■ Plaintiff asserts that Defendants' use of the term X–TEND also constitutes unlawful dilution of Wynn's trademark and injury to Wynn's business reputation. While this Court discussed such a cause of action in *Kimberly Knitwear, Inc. v. Kimberly Stores, Inc. of Michigan,* 331 F.Supp. 1339, 1341 (W.D.Mich.1971), its only cited authority was a textbook on Trademark Infringement, there being no antidilution statute in Michigan. The *Kimberly* court stated:

Plaintiff's interest in its trademark is a property right. Confusion alone is not the only result of trademark infringement.

A trademark owner is entitled to protection against anyone who disturbs its exclusive use, regardless of lack of market competition. Any use by another, even marginally, inevitably dilutes the value of the trademark and results in unfair competition.

The Court's only authority, other than cases from jurisdictions where antidilution statutes exist, was R. Callman, *Unfair Competition, Trademarks and Monopolies,* (3rd ed. 1967) § 84.2:

The gravamen of a dilution complaint is that the continuing use of a mark similar to the plaintiff's will inexorably have an adverse effect upon the value of plaintiff's mark, and that, if he is powerless to prevent such use, the plaintiff's mark will eventually be deprived of all distinctiveness. . . . This injury differs materially from that arising out of orthodox confusion. . . . Such confusion creates an immediate injury, while dilution is a cancer which, if allowed to spread, will inevitably destroy the advertising value of the mark. R. Callman, Unfair Competition, Trademarks and Monopolies, (3rd ed. 1967) § 84.2.

Injury to business reputation was also discussed in *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc., supra,* where the Court stated that because plaintiff had advertised extensively with its trademark, he had developed a substantial business reputation through use of said mark. "It is generally accepted that such business reputation will be protected even though there is no actual competition between the parties." *Id.* at 704. In *Koffler,* the court found that it was probable that the public would believe that defendant store chain was affiliated with plaintiff store chain because of defendants' use of plaintiff's logo and mark and "[s]uch acts also dilute the value of the trademark as well as the good will which Plaintiff has built through advertising and business experience." The court then enjoined defendants from such acts. As in *Kimberly,* however, the court's only authority came from jurisdictions which already had antidilution statutes. Neither case cited any Michigan authority setting forth this cause of action, and the Court is unable to find any despite careful research. The Court will not presume to create such a cause of action in a state whose legislature and courts have not seen fit to do so. Despite having promulgated extensive regulations governing trade and commerce, the state legislature has yet to enact an antidilution statute. Neither does the common law in Michigan recognize such a cause. Accordingly, Wynn cannot prevail on this claim.

## V. MICHIGAN CONSUMER PROTECTION ACT

■ Finally, Plaintiff seeks relief pursuant to the Michigan Consumer Protection Act, M.C.L.A. §§ 445.901 *et seq.* The Act provides a cause of action to consumers aggrieved by certain unfair trade practices.

Defendant counters that Plaintiff has no cause of action under the Act because Plaintiff is not a consumer, but a business. Defendant argues that the Act does not create a private right of action for a business entity in the marketplace seeking to advance its own competitive interests. Plaintiff cites no Michigan case which found a cause of action under circumstances similar to those in the present case, and the Court is unable to find any after careful research. Indeed, one of the few Michigan cases interpreting the Act states:

> We are satisfied that a clear legislative intent in enacting the Michigan Consumer Protection Act was to protect *consumers* in their purchases of goods which are primarily used for personal, family or household purposes.

*Noggles v. Battle Creek Wrecking, Inc.,* 153 Mich.App. 363, 367, 395 N.W.2d 322 (1986).

Moreover, in jurisdictions whose consumer protection statutes contain language identical or similar to that in the Michigan act, courts have held that the statutes were intended to protect individual consumers, and not businesses. The Oregon statute, with language that closely parallels that of Michigan's, was found not to apply to a transaction involving a grocery store operator who entered into an agreement with defendant under which the latter would provide the plaintiff with an ice machine to be used in plaintiff's store. The Oregon court of appeals stated:

> We do not believe, however, that this Act was intended to apply to commercial transactions of the nature alleged in this Complaint and find nothing in its legislative history to support such a contention. On the contrary, the primary purpose of the act was to protect *consumers* rather than businesses. (Emphasis in original).

This statement is particularly noteworthy because the definition of a person in the Oregon statute clearly includes a corporation, as does the definition in the Michigan statute. M.C.L.A. § 445.902(b). Both the Florida and Louisiana courts have followed the reasoning of the Oregon court; both also have statutes substantially similar to Michigan's. *Louisiana National Leasing Corp. v. ADF Service, Inc.,* 377 So.2d 92 (1979); *LJS Company v. Marks,* 480 F.Supp. 241 (S.D.Fla.1979). *See also, Toledo Metro Federal Credit Union v. Papenhagen Oldsmobile, Inc.,* 56 Ohio App.2d 218, 381 N.E.2d 1337 (1978).

In addition, the Michigan statute specifically states that it does not apply to "[a] transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state ...". M.C.L.A. § 445.904(1)(a). "An insurance company is under the authority of the Insurance Commissioner and the extensive statutory and regulatory scheme of the Insurance Code of 1956, all administered 'by a regulatory board or officer acting under statutory authority of this state.'" *Bell v. League Life Insurance Co.,* 149 Mich.App. 481, 387 N.W.2d 154 (1986), *lv. app denied,* 425 Mich. 870 (1986), *quoting, Kekel v. Allstate Insurance Co.,* 144 Mich.App. 379, 375 N.W.2d 455 (1985), *lv. app denied,* 424 Mich. 878 (1986). (Plaintiffs do not have a cause of action against their insurance company under the Michigan Consumer Protection Act.) Defendant American Way Service Corporation is an insurance company and therefore is extensively regulated under the Insurance Code of Michigan. Thus, defendant cannot be sued pursuant to the Michigan Consumer Protection Act.

## VI. RELIEF

■ Defendant's testimony as to profits appears to be not only self-contradictory, but heavily based upon records of which he originally denied the existence. It is, in short, not credible. Because on the evidence presented the court cannot gauge Plaintiff's damages resulting from Defendants' infringement, the Court will, for the following reasons, award Plaintiff attorneys fees and costs.

Defendant Warmus testified that since 1985, American Way's gross receipts from the administration of its service contracts have never been less than Five Million Dollars per year. No other figures have been provided, as Defendants had maintained

throughout discovery that income and profits from the program were "trade secrets". Warmus also testified that it is impossible to ascertain from his records what portions of the income of his corporation may be attributed to his credit life insurance business, and which portion to his X–TEND program. However, he further testified to the contrary that the real moneymaker is the credit life branch of the business, and the X–TEND program is a mere accomodation to keep his credit life customers, and generates no income.

In further contradiction, Warmus testified that his "meticulous records" indicate expenses of up to Three Million Dollars per year in promotional banners, flags, posters, etc. for his X–TEND program similar to those which Plaintiff placed in evidence. That testimony begs the question of why promotion would be necessary for an accomodation made at a loss.

Warmus additionally testified that, of the X–TEND receipts he reported pursuant to a magistrate's discovery order, 99% must be paid to an insurance company (his) to pay premiums for the coverage offered, and the balance is absorbed in administrative expenses. Moreover, he stated that all premiums not paid out to adjust claims must be returned to the dealers.

Although the Court is confident that Defendants do not operate the X–TEND program as a charitable endeavor, it cannot on the facts of record ascertain the profits made as a result of Defendants' willful infringement. Accordingly, no damages will be awarded. However, this is the exceptional case in which the award of attorneys fees is appropriate. 15 U.S.C. § 1117(a) provides that a court may, in exceptional cases, award reasonable attorneys fees to the prevailing party. *Frisch's Restaurants v. Elby's Big Boy*, 849 F.2d 1012 (6th Cir.1988). Courts generally define an exceptional case as one where the infringement is willful, deliberate, fraudulent, malicious, or constitutes other comparable conduct. *Hindu Incense v. Meadows*, 692 F.2d 1048 (6th Cir.1982). *See also*, 82 ALR Fed 143. In addition, some courts find bad faith sufficient to sustain

an award of attorneys fees where the infringer continues to use a mark after the markholder's protest or refusal of permission. *Hindu Incense, supra; Bowmar Instrument Corp v. Continental Microsystems, Inc.*, 497 F.Supp. 947 (S.D.N.Y.1980); *Raufast S.A. v. Kicker's Pizzazz, Ltd.*, 208 U.S.P.Q. 699 (E.D.N.Y.1980).

■ The Court has already found that Defendants' infringement was deliberate, and that it continued even after Plaintiff's protest and cease and desist letter. This is thus the exceptional case and an award of reasonable attorneys fees to Plaintiff is warranted. Accordingly, upon submission of a fully supported petition, under oath, the Court will entertain Plaintiff's motion for attorneys fees and for all costs of this action.

In addition, Defendant is hereby enjoined from further use of Plaintiff's X–TEND mark and is to cease and desist forthwith. Plaintiff has suffered irreparable harm from Defendants' unlawful infringement. An injunctive order can do no harm whatsoever to Warmus, by his own testimony. His personal reputation and relationship with Michigan new car dealers alone, he has claimed, has been the basis upon which they have requested that he conduct his extended warranty program for their customers, at a loss to him.

Moreover, Mr. Warmus has testified that the consumer, who is "on ether" at the time of his or her new car purchase, will sign whatever document the dealer places in front of them. Therefore, the name under which his program operates should be totally insignificant to him. Additionally, the public interest is best served by honoring incontestable trademarks and preventing consumer confusion.

## CONCLUSION

In summary, Plaintiff has clearly proven that Defendants intentionally infringed its incontestable X–TEND trademark, in violation of both 15 U.S.C. § 1114 and Michigan common law. Plaintiff has also established that Defendants engaged in unfair competition in violation of both 15 U.S.C. § 1125(a) and Michigan common law. Plaintiff can-

759

not, however, prevail on its claims for trademark dilution and violation of the Michigan Consumer Protection Act, as the Court is convinced that Michigan courts would not recognize either of those claims on these facts. Plaintiff will forthwith submit to the Court a petition setting forth its attorneys fees and costs incurred in the litigation of this matter so that the Court may entertain its motion for same.

JUDGMENT

This matter having come before the Court, and the Court having entered its Memorandum Opinion and Order; now, therefore,

IT IS HEREBY ORDERED that JUDGMENT shall be entered FOR PLAINTIFF.