WYNN OIL COMPANY, Plaintiff–
Appellee/Cross–Appellant,

v.

AMERICAN WAY SERVICE CORPORA-
TION, and Thomas A. Warmus, Defen-
dants–Appellants/Cross–Appellees.

Nos. 90–1817, 90–1871 and 90–2035.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 2, 1991.

Decided Aug. 20, 1991.

Rehearing Denied Sept. 18, 1991.

William C. Potter, Jr. (argued and briefed), Houghton, Potter, Sweeney & Brenner, Detroit, Mich., for plaintiff-appellee/cross-appellant.

Charles J. Gerlach (briefed), Raymond L. Morrow (argued and briefed), Kemp, Klein, Umphrey, Endelman & Beer, Troy, Mich., for defendants-appellants/cross-appellees.

Before MARTIN and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

MILBURN, Circuit Judge.

Defendants-appellants / cross-appellees American Way Service Corporation ("American Way") and Thomas Warmus, the president and sole shareholder of American Way, appeal from an order amending the judgment of the district court. Defendants challenge both the original judgment entered in favor of plaintiff-appellee/cross-appellant Wynn Oil Company ("Wynn") and the amended judgment entered June 26, 1989. Wynn's cross-appeal challenges the district court's failure to award damages upon finding that defen-

dants had engaged in trademark infringement and unfair competition. Also, defendants appeal the district court's order of August 16, 1990, awarding costs and attorney fees of $47,303.47 to plaintiff.

The principal issues presented in this appeal are: (1) whether the district court erred in determining that defendants' use of the mark constituted trademark infringement in violation of 15 U.S.C. § 1114; (2) whether the district court erred in determining that defendants' use of the mark constituted unfair competition in violation of 15 U.S.C. § 1125(a); (3) whether the district court erred in determining that defendants' use of the mark constituted trademark infringement and unfair competition under Michigan common law; (4) whether the district court erred in declining to award damages to Wynn based on defendants' profits; (5) whether the district court erred in finding this to be an exceptional case which justified the award of approximately $47,000 in attorney fees; and (6) whether the district court erred in granting injunctive relief as originally ordered or as amended. For the reasons that follow, we affirm in part, reverse in part, and remand.

I.

A.

On June 5, 1989, Wynn filed this action against defendants seeking damages from defendants' use of Wynn's registered trademark "X–TEND," and demanding an injunction against further use of the mark. Wynn alleged trademark infringement and unfair competition in violation of 15 U.S.C. §§ 1114 and 1125(a) as well as trademark infringement and unfair competition under Michigan common law.[1]

On March 13 and 14, 1990, the district court held a two-day bench trial. On April 30, 1990, the district court issued its opinion and order finding that the defendants' use of Wynn's X–TEND mark constituted trademark infringement and unfair compe-

---

1. The complaint also included other allegations which were disposed of by the district court and have not been made issues in this appeal.

tition under federal law, as well as common law trademark infringement and unfair competition. *Wynn Oil Co. v. American Way Service Corp.*, 736 F.Supp. 746 (E.D.Mich.1990).

Despite the district court's finding of intentional infringement, it declined to award damages or profits as directed by 15 U.S.C. § 1117(a) because it could not "ascertain the profits made as a result of Defendants' willful infringement." The district court enjoined defendants from further use of the mark and determined, partly on the basis of its perceived inability to grant a monetary award, that "this is the exceptional case in which the award of attorneys fees is appropriate [pursuant to 15 U.S.C. § 1117(a) ]." Accordingly, the court ordered Wynn to submit a petition, supported by affidavit, for attorney fees and costs.

Wynn filed its motion for attorney fees on May 14, 1990. In the meantime, on May 9, 1990, Wynn filed a motion to amend the original judgment by broadening the scope of injunctive relief. The original judgment only "enjoined ... further use of Plaintiff's X–TEND mark...." In an order entered July 3, 1990, the district court granted the motion to amend and broadened the injunctive relief to bar use of "the word or term 'X–TEND' *or any other designation confusingly similar to 'X–TEND'....*" (emphasis added).

On July 24, 1990, defendants filed their notice of appeal challenging both the original and amended judgments, and on July 30, 1990, plaintiff filed its notice of cross-appeal challenging the failure to award damages. The district court ruled on Wynn's motion for attorney fees and costs in an order entered August 30, 1990, awarding a total of $47,303.47 "in lieu of damages." Defendants' notice of appeal from this ruling was filed on September 13, 1990.

### B.

Wynn is a California corporation engaged primarily in the manufacture of car care products.[2] Since the early 1970s, Wynn has maintained two product lines. The first is a line of personal car care items for use directly by the automobile owner. This line is typically marketed under the registered trademark "Wynn's" by automotive supply outlets, discount chains, hardware stores, and similar retailers.

The second line is designed for use by the professional automobile repairman in servicing a customer's automobile. This line is marketed primarily through service stations, independent repair shops, and automobile dealers. It is typically marketed under the registered trademark "Wynn's X–TEND." (U.S. Patent Office Trademark Nos. 822,881; 997,417; 1,482,081; 1,525,053). X–TEND was first registered by another entity on January 10, 1967, and assigned to Wynn on October 15, 1971. Recently the term "Wynn's" has been deleted, and the products are now marketed under the label "X–TEND."

In the early 1970s, Wynn also began to market a product warranty program called "Wynn's X–TEND Guarantee." Under this program, a consumer who bought a "product warranty kit" (made up of X–TEND products) received a warranty against certain repair costs, provided the consumer regularly used Wynn's X–TEND auto products. This program was typically marketed through new and used automobile dealers who sold the X–TEND product line. In 1980, Wynn changed the name of its warranty program to "Wynn's Product Warranty." The marketing methodology remained essentially the same. In fact, the product warranty kit still includes a pamphlet promoting use of the X–TEND product line. The price of the warranty varies depending upon the dealer and scope of coverage selected.

Although Wynn does not advertise directly to the purchasing public, it publicizes the X–TEND mark through its distributors and retailers. Wynn encourages distributors and retailers to place advertisements

---

**2.** Because the district court's published opinion for the most part accurately sets forth the relevant facts, our opinion borrows, sometimes verbatim, from the district court's statement of facts.

in local newspapers and trade journals by providing them with an advertising allowance. Wynn also provides point of sale advertising to the distributors and retailers including posters, banners, and flags, as well as promotional items such as ink pens, thermos jugs, etc., bearing the mark "X–TEND." Hats, jackets, shirts, and other miscellaneous items of clothing bearing the logo are provided to distributors and their employees. In the state of Michigan, approximately sixteen distributors' vehicles prominently bear the mark "Wynn's X–TEND," and the mark is displayed on more than a thousand servicing machines.

Defendant American Way is a Michigan corporation based in Southfield, Michigan. Defendant Warmus is the president and sole shareholder of American Way. American Way deals primarily in insurance. In 1980, American Way introduced an extended warranty program to new and used car dealers. This program allowed the dealer to sell the contract directly to the purchaser, and American Way then administered the contract. In general, the service contract covered repair costs incurred during the period of coverage that were not otherwise covered by the manufacturer's warranty. Like Wynn's product warranty, contracts were limited to repairs necessitated by the failure of internally lubricated parts.

As early as 1985, American Way released forms, brochures, and other written literature describing its service contract as "The American Way X–TEND." Emphasis was placed on the term X–TEND. This promotional program was begun without conducting any search or investigation whatsoever to ascertain whether the term X–TEND was registered or in use.

In July 1987, Wynn became aware of American Way's use of the term X–TEND. However, according to Wynn, it was not able to ascertain American Way's address until January of 1989. On February 9, 1989, counsel for Wynn sent a letter demanding that American Way cease using the mark. Having received no response by April 10, 1989, Wynn sent a second letter explaining that it would institute litigation unless it received timely notification that American Way had ceased using the mark. On April 21, 1989, Warmus responded that he was willing to take his chances in·court. This action followed.

## II.

### A.

In this case, the important recurring question is whether defendants' use of the term X–TEND created a likelihood of confusion among ordinary consumers.

This Circuit considers the question of whether there is a likelihood of confusion a mixed question of fact and law. When reviewing a lower court's decision in these cases, we apply a clearly erroneous standard to findings of fact supporting the likelihood of confusion factors, but review *de novo* the legal question whether, given the foundational facts as found by the lower court, these facts constitute a "likelihood of confusion."

*Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186 (6th Cir.1988) (hereinafter *Wynn I*) (quoting *Frisch's Restaurant, Inc. v. Shoney's, Inc.,* 759 F.2d 1261, 1264 (6th Cir. 1985)).

### B.

"The general concept underlying the likelihood of confusion [test] is that the public believe that 'the mark's owner *sponsored or otherwise approved* the use of the trademark.'" *Carson v. Here's Johnny Portable Toilets, Inc.,* 698 F.2d 831, 834 (6th Cir.1983) (emphasis in original), *quoted in, Wynn I,* 839 F.2d at 1186. This court has identified eight factors which serve as "a guide to help determine whether confusion would be likely to result from simultaneous use of ... two contested marks." *Wynn I,* 839 F.2d at 1186 (citing *Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982)). The factors are (1) strength of plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree

of purchaser care; (7) defendants' intent in selecting the mark; and (8) the likelihood of expansion of the product lines. *Id.; Homeowners Group, Inc. v. Home Mktg. Specialists,* 931 F.2d 1100, 1106 (6th Cir. 1991). While serving as a guide, these factors "imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn I,* 839 F.2d at 1186.

The district court considered each of the eight factors in turn and determined that all but the fourth weighed in favor of confusion. The parties agree that there is no evidence of actual confusion. Defendants challenge the district court's findings with regard to the seven other factors as clearly erroneous.

### 1. *Strength of mark*

■ In evaluating the first factor, the district court followed this court's holding in *Wynn I,* 839 F.2d at 1187, that "once a mark has been registered for five years, the mark must be considered strong and worthy of full protection." Since Wynn's mark had been registered over five years without being contested, it was presumptively strong.

Defendants argue that the "court's earlier decision in *Wynn [I]* in which it equated strength with incontestability was wrong and has been criticized by leading commentators." Appellants' Brief at 11 (citing 4A Callman, *Unfair Competition, Trademarks and Monopolies* § 25.08 (4th Ed. 1983)). Wynn points out that the only challenge to the strength of Wynn's mark made in district court was that it was "merely descriptive." In *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 205, 105 S.Ct. 658, 667, 83 L.Ed.2d 582 (1985), the Supreme Court held that an infringement action may not be defended on the ground that the mark is merely descriptive, and thus invalid, if the mark has become incontestable. Although *Park 'N Fly* did not specifically equate incontestability with strength, at least one circuit in addition to this circuit has held

that when a "mark is incontestable, then it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Dieter v. B & H Indus.,* 880 F.2d 322, 329 (11th Cir.1989), *cert. denied,* —— U.S. ——, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). *But see Munters Corp. v. Matsui America, Inc.,* 909 F.2d 250, 252 (7th Cir.) (*Park 'N Fly* does not preclude consideration of a mark's strength), *cert. denied,* —— U.S. ——, 111 S.Ct. 591, 112 L.Ed.2d 595 (1990). Even if defendants had presented a persuasive argument for abandoning this court's earlier position in *Wynn I,* which they have not, this court must follow *Wynn I* as controlling authority. *See Endsley v. Young (In re Young),* 872 F.2d 176, 177 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990). Accordingly, defendants have not shown that the district court was clearly erroneous in finding that Wynn's X–TEND mark was a strong one.

### 2. *Relatedness*

■ In evaluating the relatedness of the goods, the court must bear in mind "that [it is] trying to determine whether consumers will be confused as to the origin [or sponsorship] of the product...." *Wynn I,* 839 F.2d at 1187. Thus, in *Wynn I,* the infringer's bulk car wash products and car wash franchises were related to Wynn's car care products even though Wynn's products were sold in a more convenient package. Since both products performed the same functions, the fact that the infringer sold his product in bulk was "insignificant compared to the similarities which could easily lead a purchaser of the bulk wax to believe that it [was] buying a product affiliated with Wynn's CLASSIC car care products." 839 F.2d at 1187. The service aspect was also related because "the two parties fundamentally [were] selling the same thing— a clean car." *Id.* "A consumer who was used to buying CLASSIC products to wash his or her car could easily assume that the makers of CLASSIC products had expanded into the car wash business." *Id.*

Looking to *Wynn I* for guidance, the district court reasoned that

a consumer who has used or become aware of Wynn's X–Tend car care products could easily and reasonably conclude, on seeing Defendants' mark and product, that Wynn was now offering service contracts. Insofar as internally lubricated parts are concerned, both parties are selling an assurance against future costs.

736 F.Supp. at 751. The district court also found a high degree of relatedness between Wynn's product warranty and American Way's service contract.

Defendants argue that it was improper to consider relatedness to Wynn's warranty program since that program no longer uses the X–TEND mark. The district court found that this argument was not well taken because Wynn had not completely divorced the X–TEND mark from its warranty program, and the court cited the inclusion of X–TEND advertisements in the warranty kits. Defendants further argue that since it was appropriate for the court only to compare the relatedness of the service offered by American Way to the goods (fluids and additives) marketed by Wynn, the district court's finding of relatedness is clearly erroneous. *See Wynn I*, 839 F.2d at 1187 (recognizing that relatedness diminishes between products and services).

Although defendants' arguments have a grain of validity, they fail to show that it was clear error to find a high degree of relatedness. The goods and services are sufficiently related that a consumer could easily believe that Wynn was offering (or sponsoring) the service contracts sold by American Way. Moreover, under the circumstances of this case, it was not clear error to consider the relatedness to Wynn's warranty program.

3. *Similarity*

█ In evaluating the similarity of the marks, "a court must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'" *Wynn I*, 839 F.2d at 1187 (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983)). Side-by-side compari-

son is not the test. *Id.* Defendants argue that American Way's mark is graphically distinguishable from Wynn's mark and generally appears in the context of a sales office on a printed form whereas Wynn's mark typically appears on a can or bottle of automotive fluid or additive.

Again, defendants' argument is unconvincing in light of *Wynn I*. In that case, one would expect that the term "CLASSIC CAR WASH" was normally found on a small container of Wynn's products whereas the infringer's use of that term was normally found on franchise papers or a bulk container. *Id.* Nevertheless, this court found the marks to be confusingly similar. Given the similarities between this case and *Wynn I*, the district court correctly concluded that "[t]he appearance of the two marks is similar enough that it would confuse customers 'who do not have both marks before them but who may have a "general, vague, or even hazy, impression or recollection" of the other party's mark.'" 736 F.Supp. at 751 (quoting *Wynn I*, 839 F.2d at 1188).

4. *Actual confusion*

█ As to the evidence of actual confusion, the district court found none; however, it accorded little weight to this fact. Defendants argue that the absence of evidence of actual confusion is highly significant and that the district court clearly erred in giving little weight to the absence of such evidence. Again, defendants take a position which is foreclosed by *Wynn I*, 839 F.2d at 1188.

In *Wynn I*, this court recognized that evidence of actual confusion is undoubtedly the best evidence of a likelihood of future confusion but disagreed with the high degree of significance the district court placed on the absence of evidence of actual confusion. The court recognized that actual confusion is only one of several factors and that "this factor is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Wynn I*, 839 F.2d at 1188 (quoting *Bandag, Inc. v. Al Bolser's*

*Tire Stores, Inc.,* 750 F.2d 903, 914 (Fed. Cir.1984)).

Defendants argue that this is a case in which "such evidence should have been available." Defendants show a remarkable faith in documentation for parties that claimed they could not even calculate the profits earned from their service contracts. Moreover, this court recognized in *Wynn I* that "evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial...." *Id.* Thus, the district court did not err in the weight assigned to this factor.

### 5. *Marketing Channels*

[5] The district court found an obvious overlap in the marketing channels used because "[t]here are fifteen dealerships in Michigan where both Wynn and American Way are selling under the X–TEND mark." 736 F.Supp. at 752. The district court illustrated the likelihood of confusion by stating that "[a]lthough American Way has never advertised, it has routinely placed 'X–TEND approved' placards on the windshields of used cars in numerous Michigan dealerships where all of Wynn's X–TEND banners, flags, posters and gifts are also displayed and given to customers." *Id.*

Defendants argue that evidence that they gave window stickers and placards to dealers was not enough to support an inference that those stickers and placards were placed in windows of automobiles. Moreover, defendants argue that there is no evidence to show that Wynn's promotional items ended up in the fifteen dealerships where the marketing overlapped. These arguments are without merit as the district court's conclusion is based upon permissible, and even probable, inferences from the facts. The common marketing channel of auto dealerships adds to the likelihood of confusion.

### 6. *Degree of Purchaser Care*

The next factor to be considered is the likely degree of purchaser care. In general, the less care that a purchaser is likely to take in comparing products, the greater the likelihood of confusion. *See Wynn I,* 839 F.2d at 1188. In this case, defendant Warmus admitted saying "people come in and it's like they are on ether, and they sign their name on a bunch of forms, and 90 percent of the people never see them, never get them." This testimony in and of itself is enough to support the district court's conclusion that defendants' "merchandising efforts are predicated upon an ignorant and easily confused consumer." 736 F.Supp. at 753. This is true notwithstanding defendants' argument that the district court had no evidence upon which to compare prices of its products with those of Wynn.[3]

### 7. *Intent*

The next factor to be considered is the defendants' intent in selecting the mark. Although intentional infringement is not necessary for a finding of likely confusion, the presence of that factor strengthens the likelihood of confusion. *Wynn I,* 839 F.2d at 1189. In this case, the intent factor is especially important because of its bearing on other issues.

The district court found that the defendants acted intentionally based upon underlying findings that Warmus was not a credible witness and that he had prior knowledge of Wynn's use of the X–TEND mark. Defendants argue that the district court based its finding of intent upon its personal dislike for Warmus rather than upon the "positive evidence" that it should have required. Defendants point out in their reply to Wynn's brief that Wynn's attorney essentially conceded in closing argument a lack of proof of intent:

> Intent obviously is a very difficult thing to prove, and *we have no proof to offer,*

---

**3.** The district court implied that comparable prices between American Way's warranty and Wynn's warranty increased the likelihood of confusion. From the abridged record it appears that a series of objections distracted Wynn's

witness away from stating the cost of Wynn's warranty kits. Although the district court's figures seem reasonable, they do not seem to originate from the record.

*nor did we offer any proof,* that Mr. Warmus deliberately went out and, knowing that our mark was in the marketplace, deliberately copied it.

Tr. 388–389 (emphasis added).

Although the statement of Wynn's counsel casts some doubt on the district court's finding, the deferential standard of review tips the scales in favor of upholding the finding that defendants acted intentionally. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) *(quoted in, Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12.

The proper approach then calls for looking to the entire record rather than focusing on the concession of Wynn's counsel.[4] The district court found circumstantial evidence of intentional infringement. Other circuits have held that intent to infringe can be shown by circumstantial evidence. *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.) (patent infringement), *cert. denied,* 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 843 (11th Cir.1983) (likelihood of confusion of service marks); *see also Frisch's Restaurants, Inc. v. Elby's Big Boy,* 670 F.2d 642, 649 (6th Cir.) (a district court properly "inferred" intent to confuse), *cert. denied,* 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982).

Understandably, courts have held that use of a mark with knowledge of another's prior use of the mark supports an inference of intentional infringement. *Empire Nat'l Bank v. Empire of America,* 559 F.Supp. 650, 657 (W.D.Mich.1983); *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc.,* 434 F.Supp. 697, 703–04 (E.D.Mich.1976), *aff'd without opinion,* 559 F.2d 1219 (6th Cir. 1977); *see Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.,* 119 F.2d 316, 324 (6th Cir.1941) (intent to deceive public will be presumed from continued use after attaining knowledge of another's legal mark).[5] Moreover, where "trade-marks [have] been ... long in use and ... widely advertised, it is presumed that [the infringer] had knowledge of [the marks]...." *Mishawaka,* 119 F.2d at 324.

In the present case, the X–TEND mark has been "long in use and ... widely advertised." Moreover, defendants had constructive notice of the mark through its registration. Furthermore, defendants continued to use the mark after being notified of Wynn's prior use. As the district court recognized, the likelihood that defendants acted intentionally (with knowledge of Wynn's prior use of the mark) is increased by Warmus's accounts of his "extremely close, even familial relationships with all car dealers in Michigan and his intimate knowledge of all aspects of their business." 736 F.Supp. at 753.

Of course, Warmus denied that he had knowledge of Wynn's prior use of the mark. However, there is ample evidence in the record to support the district court's rejection of Warmus's credibility. For example, Warmus testified on the one hand

---

4. The record contains a concession by defendants' counsel that is equally damaging to defendants' position. In a hearing regarding injunctive relief, defendants' counsel admitted that the court's determination that defendants acted intentionally was "certainly a permissible inference."

5. This case was reversed but only as to "the provisions of the decree dealing with the mea-

sure of profits and damages." *Mishawaka Rubber & Woolen Mfg. v. S.S. Kresge Co.,* 316 U.S. 203, 204–05, 62 S.Ct. 1022, 1023–24, 86 L.Ed. 1381 (1942). The Supreme Court held that the Sixth Circuit was wrong in requiring the plaintiff to show that the purchasers of defendant's products were victims of actual confusion. *Id.* at 206, 62 S.Ct. at 1024.

that he spent $3 million per year for promotional materials, and on the other stated that he did not need to advertise his warranty program. Warmus testified that he "never had a chance" to cease using the X–TEND mark, but in actuality, Warmus responded to Wynn's cease and desist letter with what amounted to an invitation to take him to court. Under these circumstances, the district court's determination that "Warmus obviously knew that Plaintiff's trademark was of value in attracting consumers to his service, [and] that he intended to use the mark for that service" was not clearly erroneous. 736 F.Supp. at 754.

8. *Expansion of Product Lines*

■ The final factor to be considered is the likelihood that either business will expand its product line to compete with the other. "[A] 'strong possibility' that either party may expand [its] business to compete with the other will weigh in favor of finding" infringement. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 354 (9th Cir.1979). The district court found that in this case the "likelihood is already a reality since American Way's service contract directly competes with Wynn's product warranty in the area of internally lubricated parts." 736 F.Supp. at 754.

Defendants argue that this direct competition as to the warranties is completely irrelevant since Wynn's product warranty does not use the mark "X–TEND" and has not used it for approximately ten years. However, since the bottom line question is the likelihood of confusing the consumer, the fact that Wynn previously marketed a competing product under the X–TEND mark, and continues to market a competing product, although under a different name, is highly relevant. The relevance is increased by Wynn's continued advertisement of X–TEND products in its warranty kits. The technical lines that defendants attempt to draw are inconsistent with this court's reasoning in *Wynn I* that both the infringing franchiser and Wynn's car care products were marketing the same thing; *viz.*, "a clean car."

■ Defendants suggest that even if this court does not overrule the district court's factual findings, it should conclude in its de novo determination that there is not a likelihood of confusion. Defendants assert that the absence of evidence of actual confusion strongly weighs against the likelihood of confusion. Having considered the facts of the case and the eight factors as a guide, we find the district court's analysis persuasive and supported by analogy to *Wynn I.* Accordingly, the district court's finding of trademark infringement in violation of 15 U.S.C. § 1114 was not erroneous.

C.

■ The next issue to be considered is defendants' challenge to the finding that it engaged in unfair competition in violation of 15 U.S.C. § 1125(a). Defendants concede that likelihood of confusion is the essence of an unfair competition claim and that the same factors are considered under section 1125(a) as are considered under section 1114. *See Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1264 (6th Cir.1985) (listing the same factors in an action brought under § 1125(a)); *Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985). Even the standard of appellate review is the same. *Frisch's*, 759 F.2d at 1264. Thus, as we hold that the district court was correct in finding trademark infringement, we also hold that the district court correctly found that defendants engaged in unfair competition under section 1125(a).

D.

■ We now turn to the issue of whether the district court erred in finding for plaintiff on the common law claims. The district court stated that "the factors to consider in a common law claim are included in those already considered ... under the statutory counts of trademark infringement and unfair competition." 736 F.Supp. at 756; *see Empire Nat'l Bank v. Empire of America*, 559 F.Supp. 650, 654 (W.D.Mich.1983); *Koffler Stores, Ltd. v. Shoppers Drug Mart, Inc.*, 434 F.Supp.

697, 703–04 (E.D.Mich.1976), *aff'd without opinion,* 559 F.2d 1219 (6th Cir.1977).

Defendants, however, argue that a common law unfair competition claim requires at least that plaintiff show that its trademark has taken on a secondary meaning *or* that the infringer has adopted the mark for the purpose of deceiving the public or "palming off" its goods. Since there was no evidence that X–TEND has taken on a secondary meaning, and it is defendants' position that the district court clearly erred in finding intentional infringement, defendants argue that unfair competition was not proven under Michigan law. However, the cases cited by defendants do not involve federally registered trademarks. *See Burke v. Dawn Donut Systems, Inc.,* 147 Mich.App. 42, 383 N.W.2d 98 (1985) (per curiam); *Buscemi's Inc. v. Anthony Buscemi Delicatessen and Party Store, Inc.,* 96 Mich.App. 714, 294 N.W.2d 218 (1980). Thus, it is most likely that the Michigan Supreme Court would evaluate a common law claim of unfair competition under the eight factors identified earlier. Therefore, the district court was correct for the reasons that it stated.

## III.

### A. *Profits*

The remaining assignments of error all concern the remedies afforded to Wynn. The district court granted an injunction against further use of the mark and awarded attorney fees to Wynn; however, the district court refused to award damages or profits gained by infringement. As to the monetary recovery allowable for a violation of trademark rights, 15 U.S.C. § 1117(a) provides:

> **Profits; damages and costs; attorney fees**
>
> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of costs or deduction claimed.... If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

Because the district court's decision not to grant a monetary award appears to have influenced its decision to award attorney fees, Wynn's cross-appeal challenging the failure to award profits will be considered first. The district court's decision not to grant a monetary award is reviewed under the abuse of discretion standard. *Reader's Digest v. Conservative Digest, Inc.,* 821 F.2d 800, 807 (D.C.Cir.1987).

Although the district court was convinced that defendants used the X–TEND mark for the purpose of securing an unjust gain, it declined to award damages because it could not "on the facts of record ascertain the profits made as a result of Defendants' willful infringement." 736 F.Supp. at 758. The district court's hesitancy appears to be in contravention of the statutory directive that subject to certain exceptions which do not apply in this case, "the plaintiff shall be *entitled ... to recover"* any profits defendant gained by the infringement. 15 U.S.C. § 1117(a). It is not the plaintiff's burden to prove the profits with exactness because the statute places the burden on the defendant once the plaintiff comes forward with proof of the defendant's gross sales.

In this case, plaintiffs went to great lengths to ascertain the profits made by

defendants through use of the X–TEND mark. Their efforts were largely frustrated by defendants' elusive tactics. Defendants resisted discovery on the ground that the sales information was a "trade secret." The magistrate in charge of discovery matters ordered defendants to disclose "the total dollar receipts from service contracts for the years 1985 through 1989." Defendants furnished a figure and claimed later that it was impossible to determine the sales from service contracts using the X–TEND mark because they were commingled with other sales and included monies which merely flowed through defendants. Defendant Warmus also claimed that he provided the X–TEND service contracts as a mere accommodation to his customers and that the program generated no income.

 The district court found that Warmus' denial of profits on the service contracts was self-contradictory and devoid of credibility; however, it declined to award the unjust profits because of uncertainty as to the amount. Defendants argue that the district court's approach was correct because Wynn failed to meet the burden of proving gross sales. Defendants argue that Wynn was responsible for apportioning the "total receipts" into sales of service contracts, other receipts, etc.

However, both common sense and the statute suggest that the burden of apportioning the profits should be placed on the defendants. See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206–207, 62 S.Ct. 1022, 1024–1025, 86 L.Ed. 1381 (1942) (holding that owner of the mark does not have to prove that infringer caused owner to lose sales: "The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer."); Brunswick Corp. v. Spinit Reel Co., 832 F.2d

513, 526 (10th Cir.1987) ("A defendant [infringer] whose wrongful conduct has caused the difficulty in assessing damages cannot complain that the damages are somewhat speculative."); Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc., 772 F.2d 505, 518 (9th Cir.1985) (In an action brought under federal copyright statutes, "[t]he burden of proving apportionment, (i.e., the contribution to profits of elements other than the infringed property), is the defendant's."). This court has held that in a trademark infringement case where the trademark owner seeks to recover the infringer's unjust profits, "[a]ll the inconvenience and loss from the confusion is thrown upon the party who produces it; and this rule applies, even though the innocent victim's share in the property wrongfully and inextricably commingled may apparently be a small part of the total." Dickinson v. O. & W. Thum Co., 8 F.2d 570, 574 (6th Cir. 1925).

 Defendants argue that actual confusion, proof of which is lacking in this case, must be shown to justify a monetary award. Neither of the cases cited by defendants (Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 525 (10th Cir.1987); Schutt Mfg. Co. v. Riddel, Inc., 673 F.2d 202, 206 (7th Cir.1982)) support this proposition. Defendants' cases did not discuss the "profits" language in the statute. Moreover, to the extent they can be read to require the plaintiff to prove actual confusion before he can recover profits from an infringer, they are contrary to the Supreme Court's reasoning in Mishawaka and must be disregarded. See 316 U.S. at 204, 62 S.Ct. at 1023 (holding that plaintiff was entitled to recover profits even though "there was no evidence that particular purchasers were actually deceived into believing that the [goods] sold by the [infringer] were manufactured by the [mark's owner]").

As explained by the Seventh Circuit:

The Lanham Act specifically provides for the awarding of profits in the discretion of the judge subject only to principles of equity.... "The trial court's primary function is to make violations of the Lan-

ham Act unprofitable to the infringing party." Other than general equitable considerations, there is no express requirement that the parties be in direct competition or that the infringer willfully infringe the trade dress to justify an award of profits. Profits are awarded under different rationales including unjust enrichment, deterrence, and compensation.

*Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 941 (7th Cir.1989) (citations omitted), *cert. denied,* — U.S. ——, 110 S.Ct. 1124, 107 L.Ed.2d 1030 (1990).

Accordingly, the district court abused its discretion by refusing to award plaintiffs a recovery based on defendants' profits. On remand, the district court should place the burden on defendants to prove deductions from the gross receipts from service contracts and resolve uncertainty in Wynn's favor.

### B. *Attorney Fees*

▉ Defendants argue that the district court erred in awarding attorney fees pursuant to 15 U.S.C. § 1117(a) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."). *See Frisch's Restaurants v. Elby's Big Boy,* 849 F.2d 1012, 1017 (6th Cir.1988). This court has indicated that the term "exceptional cases" means those cases in which the infringement was "malicious, willful, fraudulent, or deliberate." *Id.* (citing *Hindu Incense v. Meadows,* 692 F.2d 1048, 1051–52 (6th Cir.1982)).

The district court's award of attorney fees is reviewed under the abuse of discretion standard. Under this standard, a reviewing court will not set aside a lower court's determination "unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Taylor v. United States Parole Comm'n,* 734 F.2d 1152, 1155 (6th Cir.1984) (quoting *Balani v. Immigration and Naturalization Service,* 669 F.2d 1157, 1160 (6th Cir.1982)). Implicit in this deferential standard is the requirement that the district court weigh the relevant factors. *See id.; Black Law Enforcement Officers Ass'n v. City of Akron,* 824 F.2d 475, 479 (6th Cir.1987) (abuse of discretion in improperly applying law or using erroneous legal standards).

Defendants' primary challenge to the award of attorney fees is based upon the contention that the district court erred in finding that this case involved intentional infringement. As the district court's finding of intentional infringement is not clearly erroneous, we find no merit in this argument.

However, we find a more fundamental flaw in the award of attorney fees. In ruling on the relief to be granted, the district court stated, "Because on the evidence presented the court cannot gauge Plaintiff's damages resulting from Defendants' infringement, the Court will, for the following reasons, award Plaintiff attorneys fees and costs." 736 F.Supp. at 757. Any doubt that the district court made the award of attorney fees as a compromise for its refusal to grant a monetary award is removed by the order setting the amount of attorney fees, wherein the district court stated: "As damages were impossible to ascertain, the Court found that in lieu of damages, it would award Plaintiff it's attorneys fees and costs...." This was a clear abuse of discretion under the facts of this case.

### C. *Injunction*

#### 1. *Irreparable Injury*

▉ The next issue to be addressed is whether the district court erred in granting injunctive relief. This ruling is also reviewed for abuse of discretion. *N.A.A.C.P. v. City of Mansfield, Ohio,* 866 F.2d 162, 166 (6th Cir.1989). Defendants argue that it was error to grant injunctive relief because there was no evidence of irreparable injury to the plaintiff. Defendants also argue that the delay between July of 1987, when Wynn first learned defendants were using the mark, and the cease and desist letter of February 1989, should be viewed as invoking some form of waiver or estoppel and demonstrates that injunctive relief is not necessary. Defendants further ar-

gue that the language of the injunction as amended in the order of June 26, 1990, is vague and ambiguous, leaving them "without any clear guidance as to what marks they could or could not use...."

In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959); *Buckhorn, Inc. v. Ropak Corp.,* 815 F.2d 76 (6th Cir.1987) (unpublished opinion). However, a number of lower courts have held that in the context of an infringement action, "[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." *Koppers Co., Inc. v. Krupp–Koppers GmbH,* 517 F.Supp. 836, 849 (W.D.Pa.1981); *Jordan K. Rand, Ltd. v. Lazoff Bros., Inc.,* 537 F.Supp. 587, 597 (D.Puerto Rico 1982); *see also Black Hills Jewelry Mfg. v. Gold Rush, Inc.,* 633 F.2d 746, 753 (8th Cir.1980) ("A finding of tendency to deceive satisfies the requisite of irreparable harm."); *Design & Mfg. v. Sharp Corp.,* 656 F.Supp. 178, 180 (S.D.Ohio 1987) (in patent infringement action irreparable harm is shown from continuing infringement of valid patent) (citing *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573 (Fed.Cir.), *cert. denied,* 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983)). The irreparable injury flows "both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values...." *Koppers,* 517 F.Supp. at 850; *see Rand,* 537 F.Supp. at 597; *Sharp Corp.,* 656 F.Supp. at 180.

The above approach is consistent with this court's approach in *Wynn I* wherein the court, upon determining that the defendant was guilty of infringement, remanded to the district court with the directions to grant injunctive relief. *See* 839 F.2d at 1191; *see also Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 524–25 (10th Cir. 1987). In *Wynn I,* this court made no specific finding with regard to irreparable injury. Accordingly, defendants' argument with regard to irreparable injury is without merit.

## 2. Delay

■ Defendants also argue that plaintiff's delay in sending the cease and desist letter should preclude injunctive relief. In responding, Wynn equates defendants' argument with an assertion of the doctrine of laches. Wynn offers three convincing arguments why the doctrine of laches should not apply in this case. First, Wynn's assertion that it could not ascertain defendants' address until shortly before it mailed the cease and desist letter is undisputed. Second, Wynn's delay fell short of the analogous statute of limitations, thereby protecting Wynn by a presumption that laches does not apply. *See Tandy Corp. v. Malone & Hyde, Inc.,* 769 F.2d 362, 365 (6th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2277, 90 L.Ed.2d 719 (1986). Third, defendants have offered no evidence of prejudice which is a prerequisite to the application of the doctrine of laches. *See Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 367 (6th Cir.1984).

## 3. Language as Amended

■ Finally, defendants claim that the injunction, especially as amended, was overly vague. Interestingly, defendants cite no case law regarding the standard for specificity in the language of an injunction. Federal Rule of Civil Procedure 65, dealing with injunctions, states in subpart (d), that "[e]very order granting an injunction ... shall describe in reasonable detail ... the act or acts sought to be restrained...."

The defendants' position is that because the injunction, as amended, restrained use of marks "confusingly similar" to "X–TEND," it prevented them from using a "common English word." However, as plaintiffs point out, an injunctive command that one cease using a word that is "confusingly similar" to an existing trademark is common in trademark case injunctions. *See Bender's Federal Practice Forms,* Form No. 3381.1 (1991); 23 Am.Jur.2d *Pleadings and Practice, Trademark* § 488, Form No. 161 (1973); *Elvis Presley Enter. v. Elvisly Yours,* 936 F.2d 889, 897

(6th Cir.1991); *Brunswick Corp.*, 832 F.2d at 524; *Koffler Stores*, 434 F.Supp. at 705; *Rand*, 537 F.Supp. at 598. In fact, against the party bold enough to engage in willful infringement, such a command is necessary to prevent the infringer from making an insignificant change in the mark to avoid the injunction and then using the altered mark in a confusingly similar manner.

### IV.

In summary, the judgment of the district court is affirmed except as to the remedies awarded. The injunction against the use of the "X–TEND" mark or one "confusingly similar" is AFFIRMED; however, that part of the judgment refusing to grant a monetary award based on defendants' profits is REVERSED and REMANDED for further proceedings consistent with this opinion. The award of attorney fees is also REVERSED and REMANDED for further proceedings consistent with this opinion.