**R.L. POLK & CO., a Delaware corporation, Plaintiff,**

v.

**INFOUSA, INC., a Delaware corporation, Defendant.**

**No. CIV.02–40200.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 7, 2002.

Michael J. Barton, Anthony J. Rusciano, Plunkett & Cooney, Bloomfields Hills, MI, for Plaintiff.

Robert J. Franzinger, Jill M. Wheaton, Dykema Gossett, Detroit, MI, for Defendant.

### MEMORANDUM OPINION
### AND ORDER

GADOLA, District Judge.

Before the Court is Plaintiff R.L. Polk & Co.'s motion for a preliminary injunction

[docket entry 2]. For the reasons set forth below, the Court shall grant Plaintiff's motion.

## I. BACKGROUND

Plaintiff R.L. Polk & Co. began marketing business information directories in 1870 under the title Polk City Directories. In 1998, Plaintiff registered the trademark "Polk City Directory," U.S. Trademark Registration No. 2,203,474. Plaintiff also developed other products and services, including vehicle statistical information and a national consumer marketing database. Plaintiff marketed its other products under the trademark "Polk," registered in 1992 as U.S. Trademark Registration No. 1,725,191. Eventually, the company was organized into a Consumer Information Solutions Group, which contained the directory business, and a Transportation Group, which contained the vehicle statistical information business.

On May 1, 2000, Plaintiff sold the Consumer Information Solutions Group to Equifax, Inc. and assigned its rights in the "Polk City Directory" mark to Equifax pursuant to a Trademark Assignment Agreement (the "Assignment Agreement"). The Assignment Agreement provided that Equifax, as Purchaser, could use the "Polk City Directory" mark in a particular "Field of Use," defined as "compiling, publishing, marketing and selling of demographic or directory information (in any form of media or device including, without limitation, print, CD–ROM, or online, whether known or hereafter developed) in the form of city, suburban and regional directories containing among other things, residential business and demographic information for a particular community." (Pl.Ex. 1, Attach.A.¶¶ 1–2.)

The Assignment Agreement also provided that the Purchaser did not acquire any rights in the "Polk" mark separately or apart from its use as part of the mark "Polk City Directory," and that the Purchaser agreed not to challenge Plaintiff's continued use of the "Polk" mark outside of the Field of Use. (See Pl.Ex. 1, Attach. A. ¶¶ 3–4.) Additionally, the Assignment Agreement provided that "[t]o the extent Purchase [sic] assigns its rights under this Agreement to any person, then any such assignment shall be conditioned upon the assignee being subject to all the terms and conditions in this Agreement." (See Pl.Ex. 1, Attach. A. ¶ 6.)

In October, 2001, Equifax sold the city directories business to Defendant *info USA, Inc.* In conjunction with this sale, Equifax assigned its rights in the "Polk City Directory" mark to Defendant. Founded in 1972, Defendant sells sales and marketing information to businesses in formats including labels, lists, CD–ROMs, and through the Internet. Defendant derives its sales and marketing information from a database that it owns and manages consisting of approximately 250 million individual consumers and 14 million businesses.

On July 23, 2002, Plaintiff filed a three count complaint in this Court alleging: (I) violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); (II) breach of contract; and (III) common law unfair competition. On July 30, 2002, this Court dismissed without prejudice Plaintiff's state law claims, declining to exercise supplemental jurisdiction over those claims. Accordingly, only Plaintiff's claims alleging trademark infringement and unfair competition under the Lanham Act remain before the Court.

Plaintiff alleges, *inter alia,* that Defendant has infringed Plaintiff's rights in the "Polk" mark by using it separately from the mark "Polk City Directory." Specifically, Plaintiff alleges that Defendant has violated the Lanham Act by:

(1) utilizing the domain name "MrPOLK.com";

(2) marketing its products under the name "Polk Directories";

(3) utilizing the names "Polk Directories," and "MrPOLK.com" to market a variety of products and services;

(4) marketing and utilizing the business number "1–800–ASK–POLK" and the email address "Customer.service@MRPOLK.com";

(5) developing a logo similar to Plaintiff's logo.

(*See* Compl. at ¶ 14–15; Pl. Br. at 4–5.)

Now before the Court is Plaintiff's motion for a preliminary injunction, filed on July 23, 2002. Defendant filed its response on August 16, 2002, and Plaintiff filed a reply on August 22, 2002. The Court heard oral argument on August 28, 2002.

## II. DISCUSSION

### A. LEGAL STANDARD

"When ruling on a motion for a preliminary injunction, a district court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n,* 110 F.3d 318, 322 (6th Cir.1997).

### B. ANALYSIS

#### 1. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff alleges claims under the Lanham Act of trademark infringement and unfair competition. Thus, the Court must first consider Plaintiff's likelihood of success on the merits of these claims. Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides, in relevant part:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant .... 15 U.S.C. 1114(1)(a), (b).

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic ori-

gin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. 15 U.S.C. § 1125(a)(1)(A), (B).

■ "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.,* 109 F.3d 275, 280 (6th Cir.1997). Similarly, "likelihood of confusion is the essence of an unfair competition claim and . . . the same factors are considered under section 1125(a) as are considered under section 1114." *Wynn Oil Co. v. American Way Svc. Corp.,* 943 F.2d 595, 604 (6th Cir.1991) ("*Wynn II* ").

■ "The general concept underlying the likelihood of confusion [test] is that the public believe that the mark's owner *sponsored or otherwise approved* the use of the trademark." *Id.* at 599 (internal quotation marks and citations omitted) (alteration in original). To determine whether a likelihood of confusion exists, courts in the Sixth Circuit have examined the following eight factors:

1. strength of the plaintiff's mark;
2. relatedness of the goods;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. defendant's intent in selecting the mark;
8. the likelihood of expansion of the product lines.

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 670 F.2d 642, 648 (6th Cir.1982). "While serving as a guide, these factors imply no mathematical precision, and a plaintiff need not show that all,

or even most, of the factors listed are present in any particular case to be successful." *Wynn II,* 943 F.2d at 600 (internal quotation marks and citation omitted).

### a. Analysis of the Eight Factors

### (1) Strength of Plaintiff's Mark

■ To determine the strength of a mark, courts look to "the mark's distinctiveness and degree of recognition in the marketplace." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.,* 931 F.2d 1100, 1107 (6th Cir.1991). "A mark is strong if it is highly distinctive, i.e., if the public readily accepts it as the hallmark of a particular source; it can become so because it is unique, because it has been the subject of wide and intensive advertisement, or because of a combination of both." *Id.* (internal quotation marks and citation omitted). Courts assess a mark's distinctiveness and resulting strength by placing the mark into one of four categories: "(1) generic or common descriptive"; "(2) merely descriptive"; "(3) suggestive"; or "(4) arbitrary or fanciful." *Induct–O–Matic Corp. v. Inductotherm Corp.,* 747 F.2d 358, 362 (6th Cir.1984) (internal quotation marks and citation omitted).

"A generic term is the weakest type of mark; it is a term used to commonly describe the relevant type of goods or services, and cannot become a trademark under any circumstances." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.,* 78 F.3d 1111, 1117 (6th Cir.1996) (internal quotation marks and citation omitted). "A merely descriptive term specifically describes a characteristic or ingredient of an article," and "is entitled to protection only upon a showing of secondary meaning, that is, by becoming distinctive of the applicant's goods." *Id.* (internal quotation marks and citations omitted). A suggestive term "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or

listener to use imagination and perception to determine the nature of the goods." *Id.* (internal quotation marks and citation omitted). The final category encompasses fanciful or arbitrary marks, which are the strongest type of mark. *Id.*

An arbitrary mark has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which it is attached, such as CAMEL cigarettes or APPLE computers. A fanciful mark is a combination of letters or other symbols signifying nothing other than the product or service to which the mark has been assigned, such as EXXON or KODAK.

*Id.* (internal quotation marks and citation omitted).

■ Here, the "Polk" mark is a surname. A surname is descriptive and is only subject to protection if it has acquired secondary meaning. *Marker Int'l v. De-Bruler,* 844 F.2d 763, 764 (10th Cir.1988); *see* 15 U.S.C. 1052(e)(4). " 'To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.' " *Blockbuster Entmt. Group v. Laylco, Inc.,* 869 F.Supp. 505, 510 (E.D.Mich.1994) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)). Courts in the Sixth Circuit have analyzed the following factors when determining whether a mark has acquired secondary meaning: "1. direct consumer testimony; 2. consumer surveys; 3. exclusivity, length, and manner of use; 4. amount and manner of advertising; 5. amount of sales and number of customers; 6. established place in the market; and 7. proof of intentional copying." *Mktg. Displays, Inc. v. TrafFix Devices, Inc.,* 200 F.3d 929, 937 (6th Cir.1999), *rev'd*

*on other grounds,* 532 U.S. 23, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001).

Plaintiff does not address the distinctiveness of its mark. Rather, Plaintiff relies solely upon a presumption that its mark is strong because it has become "incontestable," *i.e.,* the "Polk" mark has been in continuous use for five consecutive years without successful challenge. *See Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1186–87 (6th Cir.1988) (*"Wynn I "*); *Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419, 422 (6th Cir.1999); 15 U.S.C. § 1065.

Since the decision in *Wynn I,* however, another panel of the Sixth Circuit has indicated that a descriptive mark's incontestable status alone does not establish the strength of the mark. *See Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002). The court in *Therma–Scan* noted that simply "[t]reating a valid, incontestable trademark as an exceptionally strong mark for the purpose of determining whether confusion is likely to occur, without examining whether the mark is distinctive and well-known in the general population, would shift the focus away from the key question of whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Id.* (internal quotation marks and citation omitted). This holding appears to be in conflict with the Sixth Circuit's holding in *Wynn I. See* 839 F.2d at 1187.

■ This Court notes that one panel of the Sixth Circuit cannot overrule another panel's decision and that "[t]he prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or [the Sixth Circuit] sitting en banc overrules the prior decision." *In re Young,* 872 F.2d 176, 177 (6th Cir.1989). Therefore, the panel decision in *Therma–Scan* does not prevent this Court

from finding that Plaintiff's mark is presumptively strong based upon the mark's incontestable status. Indeed, this case presents a situation appropriate for application of the presumption of strength based upon incontestability. Defendant argued at the hearing that Plaintiff's mark was "merely descriptive." Rejecting this same argument, the Court in *Wynn II* concluded " 'that when a mark is incontestable, then it is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark.' " 943 F.2d at 600 (internal quotation marks and citation omitted). Therefore, based upon the fact that the "Polk" mark has become incontestable, this Court finds that the mark is at least descriptive with secondary meaning.

Defendant raises several issues that it contends demonstrate the weakness of Plaintiff's mark. Defendant has adduced evidence of numerous third party registrations involving some variation of the word "Polk" as well as registered corporate names involving variations of the word "Polk." (*See* Def. Ex.: Woods Aff., Exs. A & B.) "It is true that the more common a word or phrase is, the less inherent trademark strength it may have . . . ." *Daddy's Junky Music Stores*, 109 F.3d at 281. However, " 'merely showing the existence of marks in the records of the Patent and Trademark Office will not materially affect the distinctiveness of another's mark which is actively used in commerce. In order to be accorded weight a defendant must show what actually happens in the marketplace.' " *Id.* (quoting *Homeowners Group*, 931 F.2d at 1108). Thus, in order to prove that third party registrations weaken Plaintiff's mark, Defendant must show that third parties using the "Polk" mark are engaged in the same business in which Plaintiff is engaged. *See id.* (citing *Nat'l Cable Television Assoc., Inc. v. Am. Cinema Editors, Inc.*, 937 F.2d 1572, 1579–80 (Fed.Cir.1991)). Defendant has made no

such showing as to the third party registrants, and thus the existence of such registrants does not weaken Plaintiff's mark.

Next, Defendant argues that Plaintiff "has abandoned the registered mark in its broadest sense, preferring to stake its identity on the stylized version." (Def. Br. at 15.) In support of this argument, Defendant cites *Allard Enterprises, Inc. v. Advanced Programming Resources, Inc.*, 249 F.3d 564 (6th Cir.2001). In *Allard*, the Sixth Circuit noted:

> [a]t common law, ownership of trademark or service mark rights is obtained by actual use. The first to use a mark in the sale of goods or services is the "senior user" of the mark and gains common law rights to the mark in the geographic area in which the mark is used. Ownership rights flow only from prior use—either actual or constructive. Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce, but federal registration is prima facie evidence of the registrant's ownership and exclusive right to use the mark and constitutes constructive use of the mark.

*Allard*, 249 F.3d at 571–72 (citations omitted).

The *Allard* case thus addresses priority rights at common law. Here, priority is not an issue. Defendant is not claiming to be a senior user of the "Polk" mark with common law rights superior to Plaintiff's. Thus, the *Allard* case is inapposite to Defendant's claim that Plaintiff has abandoned its registered mark in its broadest sense. Similarly unhelpful on this point is Defendant's citation to 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 16:1 (4th ed.2002), which also addresses priority at common law. Further, although "abandonment" is a defense to infringement, *see* 15 U.S.C. 1115(b)(2),

Defendant has made no attempt to prove the statutory requirements of this defense. *See* 15 U.S.C. § 1127. Therefore, because Defendant has provided no persuasive authority for its argument that Plaintiff can protect only the stylized version of the "Polk" mark, the Court rejects this argument.

Finally, Defendant argues that " 'equitable principles, including laches, estoppel, and acquiescence' are defenses against incontestability." (Def. Br. at 15) (quoting 15 U.S.C. § 1115(b)(9)). In this regard, Defendant appears to assert that Plaintiff has acquiesced in its rights to the "Polk" mark to some extent because it allowed Equifax, Inc. to use the telephone number "1–800–ASK–POLK" and has allowed Defendant to do the same since October, 2001.

Equifax's use of the telephone number, however, was pursuant to a licensing agreement. Plaintiff licensed the telephone number "1–800–ASK–POLK" to Equifax, Inc. for a brief period of time following Plaintiff's assignment of the "Polk City Directory" mark in 2000. (*See* Pl. Reply at 3, Ex. C.) Equifax's license expired on December 31, 2000. (*See* Pl. Reply, Ex. C.) After that time, Equifax was required to cease using the "Polk" mark in connection with the telephone number but could continue to use the underlying number without reference to Plaintiff's mark. (*See* Pl. Reply, Ex. C.) Therefore, Defendant has not presented any evidence that Plaintiff has acquiesced in the use of the "Polk" mark in connection with the telephone number "1–800–ASK–POLK," and Defendant's argument on this issue is without merit.

Because the "Polk" mark has become incontestable, the Court has concluded that the mark is at least descriptive with secondary meaning. Therefore, the Court concludes that Plaintiff's mark is strong, which increases the likelihood of confusion.

### (2) Relatedness of the Goods

The Sixth Circuit has concluded "that there are basically three categories of cases" describing the degree of relatedness between the parties' services: "(1) direct competition of services, in which confusion is likely if the marks are sufficiently similar; (2) services are somewhat related but not competitive, so that likelihood of confusion may or may not result depending on other factors; and (3) services are totally unrelated, in which case confusion is unlikely." *Homeowners Group*, 931 F.2d at 1108. Thus, determining whether the goods or services are related "focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they 'come from the same source, or are somehow connected with or sponsored by a common company.' Goods or services are not necessarily related, however, simply because they coexist in the same broad industry." *Therma–Scan*, 295 F.3d at 633 (6th Cir. 2002) (quoting *Homeowners Group*, 931 F.2d at 1109).

> Plaintiff argues that:
>
> [b]oth parties are in the business of compiling and selling consumer information and data. The parties directly compete in the automotive business. Thus, the products and services the parties sell are very similar. A customer could easily assume the information and data it is purchasing from Defendant under the Polk name is sponsored or approved by the Plaintiff.

(Pl. Br. at 13.) In support of this contention, Plaintiff offers the affidavit of its Chief Executive Officer, Stephen R. Polk, who avers that "[b]oth companies sell mailing lists and database products to automotive companies, dealers, finance companies, automobile advertising agencies known as traffic builders, and other automotive-re-

lated businesses." (*See* Pl.Ex. 1, Polk Aff. ¶ 15.) Plaintiff also offers, along with Mr. Polk's affidavit, a sales letter written by one of Defendant's employees, on "Polk Directories" letterhead, dated January 7, 2002, in which the employee states that Defendant offers " 'History' automotive data through June of 2,000 [sic]." (*See* Pl.Ex. 1, Polk Aff. ¶ 12(B); Pl.Ex. 1.F.) This letter, addressed to Southwest Automotive Marketing, appears to be some evidence that the businesses of Plaintiff and Defendant may overlap.

In response, Defendant offers the affidavit of its Chief Executive Officer, Vinod Gupta, who avers:

> *info* USA and R.L. Polk & Co. are in different businesses. R.L. Polk & Co. primarily sells vehicle registration data; on the other hand, *info* USA primarily sells general consumer and business data. These are distinctly different product segments. R.L. Polk & Co. got out of the city directory and consumer information business when it sold that business to Equifax in 2000 .... Conversely, *info* USA used to sell vehicle registration data—licensed from R.L. Polk & Co.—but has gotten out of that business due to Congressional restrictions. As a result, R.L. Polk & Co. and *info* USA operate in different markets.

(Def. Ex: Gupta Aff. ¶ 5. a.)

Although Mr. Gupta states that Plaintiff sells primarily vehicle registration data and Defendant does not, his affidavit does not appear to dispute Plaintiff's general contention that both "companies sell mailing lists and database products to automotive companies, dealers, finance companies, automobile advertising agencies known as traffic builders, and other automotive-related businesses." (*See* Pl.Ex. 1, Polk Aff. ¶ 15.) As Plaintiff argued at the hearing, Plaintiff left the general consumer information business with the sale of its Consumer Information Solutions Business to Equifax. However, Plaintiff continues to market the same type of information to the automotive industry. Defendant's marketing letter to Southwest Automotive Marketing is also some evidence of this general overlap in services and customers.

Based upon the information presented at this stage of the proceedings, the Court concludes that the companies' services are at least somewhat related, if not overlapping to some extent. Because of the high degree of similarity between the marks, discussed in the next section, the Court concludes that the parties services are related enough to result in a likelihood of confusion.

### (3) Similarity of the Marks

When evaluating the similarity of the marks, a court is not to compare the marks "side-by-side." *See Wynn I,* 839 F.2d at 1187. "Instead, a court must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented." *Id.* (internal quotation marks and citation omitted). The analysis "includes examining the pronunciation, appearance, and verbal translation of conflicting marks." *Id.* at 1188. The inquiry also involves whether "the appearance of the marks is similar enough that it may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (internal quotation marks and citation omitted). "Moreover, courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junky Music Stores,* 109 F.3d at 283.

Plaintiff's mark consists of the word "Polk." Plaintiff simply asserts that the similarity issue "cannot be disputed" because "Defendant is using the 'Polk' mark improperly." (Pl. Br. at 14.) Plaintiff has

cited the following examples of allegedly improper use of the "Polk" mark by Defendant: (1) the domain name "MrPOLK.com"; (2) the telephone number "1-800-ASK-POLK"; (3) the email address "Customer.service@MrPOLK.com"; (4) the phrase "Polk Directories" as used to market products and on letterhead; (4) the word "Polk's" displayed on the cover of Defendant's July, 2002 catalogue; and (5) Defendant's logo which uses the word "Polk" in large letters above the word "Directories" in small letters.

The Court begins its similarity analysis with Defendant's July, 2002, catalogue, which illustrates many of the examples of alleged infringement. In the top left corner of the catalogue's front page is the word "Polk's" printed in large, red, capitalized letters. (See Pl. Reply, Ex. E.) On the lower left corner of the catalogue's front page is Defendant's logo, which contains the word "Polk" printed in large, red, lowercase letters above the word "Directories" printed in smaller, blue, capitalized letters. On the lower right corner of the catalogue's front page is the domain name "MrPOlk.com" and the email address "customerservice@MrPolk.com." The domain name also appears on the left side of the cover just below the middle of the page.

Certainly, the word "Polk's" as used on the cover of Defendant's catalogue is identical to the "Polk" mark in terms of pronunciation, verbal translation, and appearance. Thus, Defendant's use of the word "Polk's" is likely to cause confusion.

The Court also finds that Defendant's use of the domain name "MrPOLK.com" is likely to cause confusion based upon the name's similarity to the "Polk" mark. Although the domain name contains the letters "Mr" before Polk, these letters, which are used to designate the courtesy title "mister" before the surname "Polk," add little meaning to the mark. Obviously, courtesy titles may be used before any surname. Thus, removing this title leaves only Plaintiff's mark. Indeed, the addition of indistinguishable letters or words to a plaintiff's mark in a domain name does not eliminate a likelihood of confusion. *See Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F.Supp.2d 635, 642 (E.D.Mich. 2001) (holding "that, unless words or letters added to the plaintiff's mark within the domain name clearly distinguish it from the plaintiff's usage, allegations that a domain name incorporates a protected mark generally will suffice to satisfy the 'identical or confusingly similar to' requirement" of the Anticybersquatting Consumer Protection Act) (footnote omitted); *PACCAR, Inc. v. Telescan Tech., L.L.C.*, 115 F.Supp.2d 772, 780 (E.D.Mich.2000) (concluding that the defendant's addition of the words "truck," "newtrucks," or "usedtrucks" to the plaintiff's marks, Peterbilt and Kenworth, did not distinguish the defendant's domain names from the plaintiff's marks; noting that "[b]ecause Peterbilt and Kenworth are so closely associated with trucks, 'peterbilttrucks.com' is not appreciably different from 'peterbilt.com.'"); *cf. Induct-O-Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 363-64 (6th Cir.1984) (concluding that "Induct-O-Matic" was deceptively similar to "Inducto" despite the descriptive phrase "Matic").

A similar analysis applies to Defendant's use of the email address, "Customer.service@MrPOLK.com" and the telephone number, "1-800-ASK-POLK." The words "customer service" in the email address denote no more than a function associated with Defendant's business and add little meaning to the mark. Eliminating these descriptive words leaves only the domain name, "MrPolk.com," which the Court has concluded is similar enough to Plaintiff's mark to cause a likelihood of confusion. The telephone number contains merely a standard "1-800" prefix followed by the word "ASK," which implies a customer

service function. Again, neither of these aspects of the telephone number add meaning to the mark. Eliminating these descriptive aspects of the telephone number leaves simply "Polk," which is Plaintiff's mark.

Next, the Court finds that Defendant's use of the phrase "Polk Directories" could result in confusion because of its similarity to Plaintiff's mark. Although courts are not to focus on individual components of the marks, here, the word "Polk" "is not merely a *component* of the ["Polk"] mark[ ]: it *is* the mark[ ]." *Daddy's Junky Music Stores,* 109 F.3d at 283. Indeed, consideration of the word "Polk" alone is especially important in light of Defendant's abbreviation of the "Polk City Directory" mark as "Polk Directories" or as simply "Polk's." *See id.* (noting that "[t]he failure to fully consider 'Daddy's' alone was especially detrimental to the extent that defendant presents itself as 'Big Daddy's Music,' 'Big Daddy's,' and 'Big Daddy,' all of which are more similar to 'Daddy's' than is the full name of defendant").

Finally, the Court concludes that Defendant's logo, which emphasizes the word "Polk," written in large letters above the word "Directories," written in small letters, is confusingly similar to Plaintiff's logo. (*See* Pl. Br., Ex. 3). Plaintiff's logo also displays the word "Polk," written in large letters above the words "Automotive Intelligence," written in small letters. The logos do utilize different type faces. Yet, consistent with the analysis above, both logos emphasize the word "Polk." In addition, it is notable that Defendant again has abbreviated the "Polk City Directory" mark in its logo to merely "Polk Directories." For these reasons, the Court concludes that the overall impression of Defendant's logo is similar enough to Plaintiff's logo to contribute to a likelihood of confusion.

Defendant relies upon the analysis in *Jet, Inc. v. Sewage Aeration Sys.,* 165 F.3d 419 (6th Cir.1999), for its argument that the parties' marks are not confusingly similar. In *Jet* the court noted that "[t]he most prominent part of AEROB–A–JET is not the shared term JET but the initial syllables AEROB–A, and there is no indication in the record that SAS or anyone else commonly abbreviates AEROB–A–JET as merely Jet." 165 F.3d at 423. This Court finds *Jet* distinguishable, however, in light of the Court's conclusion that the most prominent part of the marks at issue is the word "Polk" as well as the evidence that Defendant tends to abbreviate the "Polk City Directory" mark.

Defendant also relies upon *Holiday Inns, Inc. v. 800 Reservation, Inc.,* 86 F.3d 619 (6th Cir.1996), where Holiday Inns alleged that the defendant had infringed its trademark telephone number, "1–800–HOLIDAY." *Id.* at 620. The allegedly infringing activity was Defendant's use of the number "1–800–405–4329," which constituted the alphanumeric "1–800–H[zero–]LIDAY." *Id.* The court found no Lanham Act violation, concluding that the defendant had not used the plaintiff's protected mark. *Id.* at 625. The court's holding was based in large part upon the fact that the defendant had "only used the number, 1–800–405–4329—that is, a number which is neither phonetically nor visually similar to Holiday Inn's trademark, 1–800–HOLIDAY." *Id.* at 623. Accordingly, *Holiday Inns* does not support Defendant's argument that the marks in this case are not similar.

For the reasons stated above, the Court finds that Plaintiff has demonstrated that Defendant's various uses of the term "Polk" are similar enough to the "Polk" mark to create a likelihood of confusion.

### (4) Evidence of Actual Confusion

On this factor, Plaintiff states that "[a]t this stage of the litigation, [it] does not intend to introduce evidence of actual confusion," and that "[t]here is nothing to indicate that this is a case in which such evidence should be available." (Pl. Br. at 14.) The Sixth Circuit has noted that the absence of evidence of actual confusion does not necessarily preclude a finding of a likelihood of confusion. *See Wynn I*, 839 F.2d at 1188. The court reasoned that, "because evidence of actual confusion is difficult to produce and frequently discounted as unclear or insubstantial, this factor is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available." *Id.* (internal quotation marks and citation omitted).

Therefore, the Court concludes that although Plaintiff does not offer evidence of actual confusion, the lack of such evidence does not weigh heavily against an ultimate finding of likelihood of confusion.

### (5) Marketing Channels Used

This factor "requires a court to consider the similarities or differences between the predominant customers of the parties' respective goods or services," as well as "whether the marketing approaches employed by each party resemble each other." *Daddy's Junky Music Stores*, 109 F.3d at 285.

Obviously, dissimilarities between the predominant customers of a plaintiff's and defendant's goods or services lessens the possibility of confusion, mistake, or deception. Likewise if the services of one party are sold through different marketing media in a different marketing context than those of another seller, the likelihood that either group of buyers will be confused by similar service marks is much lower than if both parties sell their services through the same channels of trade.

*Homeowners Group*, 931 F.2d at 1110.

In support of this factor, Plaintiff first argues that "both parties market their products over the Internet. The use of the web as a marketing channel has been recognized as a significant basis for finding a potential for customer confusion." (Pl. Br. at 14.) Plaintiff cites for this proposition *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir.2000), where the Ninth Circuit noted that "the use of remarkably similar trademarks on different web sites creates a likelihood of confusion amongst Web users." *Id.* at 1206–07.

Plaintiff's general claim that both parties market their products over the Internet is unavailing, however, in light of the Sixth Circuit's conclusion that "a non-specific reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory." *Therma–Scan*, 295 F.3d at 637. Rather, to determine whether use of the Internet is evidence that the parties utilize similar marketing channels, the Court must consider: "(1) whether both parties use the Web as a *substantial* marketing and advertising channel, (2) whether the parties' marks are utilized in conjunction with Web-based products, and (3) whether the parties' marketing channels overlap in any other way." *Id.* (internal quotation marks and citation omitted). Plaintiff has failed to provide the Court with information sufficient to answer these questions. Therefore, Plaintiff's mere assertion that the parties market their products over the Internet is insufficient to establish that the parties utilize similar marketing channels.

Plaintiff next argues that "[t]he parties also sell their products through sales representatives." (Pl. Br. at 14.) Plaintiff states that Defendant's sales representa-

tives market "directly to Plaintiff's customers using a former employee of Plaintiff and using the Polk name in a manner not authorized by the Assignment Agreement." (Pl. Br. at 15.) As evidence of this claim, Plaintiff cites the sales letter, discussed previously, from one of Defendant's employees to Southwest Automotive Marketing. (*See* Pl.Ex. 1.F.) This letter is some evidence that the parties have an overlapping customer base. In addition, as the Court noted in its discussion of the relatedness of the parties' services, there is some evidence that the parties both market their services to the automotive industry in general.

Although Plaintiff has produced some evidence that the parties share common customers, Plaintiff has failed to demonstrate that the parties utilize similar marketing channels. Indeed, based upon the sparse record before the Court on this issue, the Court is unable to draw any type of conclusion regarding the marketing channels utilized by the parties. Therefore, the Court concludes that this factor, while not weighing heavily against Plaintiff, does not necessarily indicate a likelihood of confusion.

### (6) Likely Degree of Purchaser Care

Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Homeowners Group,* 931 F.2d at 1111.

Plaintiff asserts that the parties sell to a variety of customers, which results in a wide variance in the degree of care exercised. Defendant contends that its customers are likely to exercise a higher degree of care than the ordinary public because its products, marketing lists and research, are relatively expensive and most often purchased by businesses. (Def. Br. at 10.) For example, a Polk City Directory for suburban Lansing, Michigan, costs $115.00, and a Directory for Ann Arbor, Michigan, costs $265.00.

Plaintiff argues, however, that even if the parties' customers are sophisticated, two factors demonstrate a likelihood of confusion amongst these customers. First, Plaintiff relies upon the Assignment Agreement between Plaintiff and Equifax. Plaintiff argues that the parties to the Assignment Agreement expressly acknowledged that confusion was likely by limiting use of the "Polk City Directory" mark to a carefully defined "Field of Use." Second, Plaintiff argues that because both parties market their products over the Internet, customers could more readily become confused based upon the ease with which Internet users can choose between websites.

The Court agrees with Plaintiff's first argument, that the Assignment Agreement is some evidence of an acknowledgment that customers would be confused by use of the "Polk City Directory" mark outside of the "Field of Use." As explained more fully in the Court's discussion of intentional infringement, *infra,* the Court notes that Defendant, as Equifax's assignee, is bound by and deemed to be aware of the limitations set forth in the Assignment Agreement.

The Court finds Plaintiff's second argument, regarding customers' use of the Internet, less persuasive. As the Court noted in its discussion of marketing channels, *supra,* Plaintiff has failed to clearly establish the extent to which the parties' rely

upon the Internet in marketing their products.

The Court notes, additionally, that "[t]he effect of purchaser care, although relevant, will be less significant than, or largely dependent upon, the similarity of the marks at issue." *Daddy's Junky Music Stores,* 109 F.3d at 286 (noting that "confusingly similar marks may lead a purchaser who is extremely careful and knowledgeable about the [musical] instrument that he is buying to assume nonetheless that the seller is affiliated with or identical to the other party"). Here, as discussed above, Defendant is using marks quite similar, and in at least one case virtually identical, to Plaintiff's mark. Accordingly, even if the parties' customers are sophisticated and exercise a higher degree of care than the ordinary buyer, a likelihood of confusion is possible based upon the similarity of the marks.

### (7) Defendant's Intent in Selecting the Mark

"[I]f the mark was chosen with the intent of deriving benefit from the reputation of [the plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Wynn I,* 839 F.2d at 1188–89 (internal quotation marks and citation omitted). "Direct evidence of intentional copying is not necessary to prove intent. Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Daddy's Junky Music Stores,* 109 F.3d at 286. "When a defendant, who is aware of the name, mark or other device of the plaintiff, appropriates it without justification, it is conclusively presumed that he intends all injuries attributable to his intentional piracy. The similarity itself may be sufficient evidence." *W.S.M., Inc. v. Tennessee Sales Co.,* 709 F.2d 1084, 1087 (6th Cir.1983) (citation omitted).

Here, Plaintiff argues that the existence of the Assignment Agreement is evidence that Defendant had knowledge of and intentionally infringed the "Polk" mark. Defendant argues that the Assignment Agreement, through which Plaintiff assigned its interest in the "Polk City Directory Mark" to Equifax, is not dispositive of Defendant's intent. Defendant contends that because it was not a party to the Assignment Agreement, it is not subject to the limitations of that Agreement. For the following reasons, the Court finds Defendant's position to be without merit.

It is undisputed that Equifax assigned its interest in the "Polk City Directory" mark to Defendant. (*See* Def. Ex.: Gupta Aff. ¶¶ 6–7 & Ex. B; Pl.Ex. 1, Polk Aff. ¶ 6.) Defendant asserts, however, that it did not expressly assume any obligations under its agreement with Equifax, nor did its agreement with Equifax refer to the Assignment Agreement between Equifax and Plaintiff. (*See* Def. Ex.: Gupta Aff. ¶ 7.) The agreement between Equifax and Defendant provides, in relevant part: "ASSIGNOR does hereby assign unto the said ASSIGNEE all right, title, and interest in and to the said trademarks effective October 1, 2001 together with the goodwill of the business symbolized by the trademarks, the registrations thereof (as applicable) and the right to recover for damages and profits and all other remedies for past infringements thereof." (Def. Ex.: Gupta Aff., Ex. B.) Defendant is correct insofar as its agreement with Equifax refers to neither the Assignment Agreement between Equifax and Plaintiff nor to the limitations set forth in that Agreement.

Nevertheless, an assignee "stands in the shoes of the assignor and acquires the same rights as the assignor possessed." *Professional Rehab. Assoc. v. State Farm Mut. Auto. Ins. Co.,* 228 Mich. App. 167, 177, 577 N.W.2d 909 (1998); *see*

*also* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:15 (4th ed.2002) (noting that "an assignee, by following in the footsteps of the assignor, acquires not only all the rights and priorities of the assignor, but also any burdens and limitations on use that were incumbent on the assignor"); *cf.* 10 Mich. Civ. Jur. Franchises § 7 (2002) (noting that "[t]he assignee is subject to the same duties and liabilities as the assignor and is chargeable with knowledge of these duties and liabilities"); *Hyosung Am., Inc. v. Sumagh Textile Co.,* 934 F.Supp. 570, 576 (S.D.N.Y.1996) (noting that "the knowledge of an assignor must be attributed to its assignee"), *aff'd in part, rev'd in part on other grounds,* 137 F.3d 75 (2d Cir. 1998); *Cont'l Ins. Co. v. M.B. Operating Co.,* Nos. CA 7176, CA 7181 1987 WL 17633, at *2 (Ohio App. Sept. 21, 1987) (noting that "[t]he assignee is presumed to know what rights are being assigned to him, and that the assignor cannot assign rights greater or superior to those which the assignor in fact possesses").

 Plaintiff assigned to Equifax the "Polk City Directory" mark. Therefore, Equifax, as Defendant's assignor, could assign to Defendant rights to the "Polk City Directory" mark only. Moreover, as an assignee of the "Polk City Directory" mark, Defendant is presumed to know the rights assigned to it, including any limitations on those rights. As Equifax's assignee Defendant need not have been a signatory to the first Assignment Agreement in order to be bound by it. Indeed, the Assignment Agreement between Equifax and Plaintiff required Equifax to condition any subsequent assignment of the "Polk City Directory" mark upon the assignee being subject to all the terms and conditions of the Assignment Agreement. The Court also notes the unlikelihood that Defendant, a sophisticated business, would accept assignment of the rights to the "Polk City Directory" mark from Equifax without even questioning the origin of those rights or any limitation on those rights.

In any event, based upon the law of assignments as applied to the facts of this case, the Court shall infer that Defendant, as an assignee of the "Polk City Directory" mark, had knowledge of the rights and limitations associated with the use of that mark as set forth in the Assignment Agreement between Plaintiff and Equifax. Therefore, insofar as Defendant has infringed the "Polk" mark, the Court finds that Plaintiff has demonstrated a likelihood of success on the merits of its claim that such use was intentional.

The Court notes that additional evidence, aside from the Assignment Agreement between Equifax and Plaintiff, buttresses Plaintiff's contention that Defendant was well aware of the "Polk" mark. "[T]he extensive advertising and long-term use of a protected mark can create a presumption that the alleged infringer knew of the protected mark." *Daddy's Junky Music Stores,* 109 F.3d at 286. Here, Plaintiff has submitted a news release published by Defendant following Defendant's acquisition of the "Polk City Directory" mark and excerpts from Defendant's website, both of which indicate that Defendant was well aware of the existence of R.L. Polk & Co. and the origins of the "Polk City Directory" mark. (*See* Pl. Br., Ex. 1, Attach. E; Pl. Reply, Ex. D.) Indeed, the pages from Defendant's website tout the long history of the "Polk Company." (*See* Pl. Br., Ex. 1, Attach. E.) Thus, Defendant can hardly disclaim knowledge of Plaintiff's mark. With Defendant's admitted knowledge of R.L. Polk & Co., a strong presumption arises that Defendant's use of the "Polk" mark, such as on the cover of its July, 2002, catalogue, was intentional. *Cf. Century 21 Real Estate*

*Corp. v. Magee,* 1991 WL 318797, 19 U.S.P.Q.2d 1530, 1534–35 (C.D.Cal.1991) (finding a presumption of intentional infringement despite defendant's claim that he had never heard of plaintiff's mark; noting that defendant had adopted a virtually identical mark and continued using the mark even after receiving notice of the owner's rights); *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 825 (D.N.J.1980) (finding intentional infringement despite defendant's "innocent adoption" defense where sole stockholders of defendant had visited plaintiff's hotel nine months prior to opening their beauty salon using a mark identical to plaintiff's; noting that defendants were clearly aware of plaintiff's mark). Based upon the evidence that Defendant was well aware of Plaintiff's mark, the Court concludes that Defendant's infringing use of the "Polk" mark was intentional.

### (8) Likelihood of Expansion of Product Lines

"Inasmuch as a trademark owner is afforded greater protection against services that directly compete or are in the same channels of trade, a 'strong possibility' that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing." *Homeowners Group,* 931 F.2d at 1112.

Plaintiff has not offered evidence on the issue of the expansion of product lines, asserting that "[t]his factor is not in issue" because "[t]he parties are competitors." (Pl. Br. at 16.) Absent some showing by Plaintiff, the Court cannot conclude that this factor indicates a likelihood of confusion. The Court notes, however, that while "an affirmative finding [on this issue] will provide a strong indication that the parties' simultaneous use of the marks is likely to lead to confusion ... a negative finding is not a strong indication to the

contrary." *Champions Golf Club,* 78 F.3d at 1122.

### b. Summary of the Eight Factors

As noted above, although the eight factors "serv[e] as a guide, these factors imply no mathematical precision, and a plaintiff need not show that all, or even most, of the factors listed are present in any particular case to be successful." *Wynn II,* 943 F.2d at 600 (internal quotation marks and citation omitted). Here, Plaintiff has demonstrated a likelihood of confusion based upon five of the eight factors: (1) the strength Plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (6) likely degree of purchaser care; and (7) Defendant's intent. As noted above, the Court's finding that Defendant's infringement was intentional alone can support a finding of a likelihood of confusion. *See Wynn I,* 839 F.2d at 1188–89 (internal quotation marks and citation omitted). In addition, the Court found that the remaining three factors, (4) evidence of actual confusion; (5) marketing channels used; and (8) the likelihood of expansion of the product lines, did not weigh heavily against the finding of a likelihood of confusion. Therefore, the Court concludes that Plaintiff has established a likelihood of success on the merits of its Lanham Act claims.

### 2. Whether Plaintiff Would Suffer Irreparable Injury Without an Injunction

"In general, a party seeking an injunction must show that absent the injunctive relief, he would suffer irreparable harm." *Wynn II,* 943 F.2d at 608. Plaintiff asserts that a finding of a likelihood of confusion establishes irreparable harm to Plaintiff. The court in *Wynn II* observed that "a number of lower courts have held that in the context of an in-

fringement action, '[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears.'" *Wynn II,* 943 F.2d at 608 (citations omitted). Moreover, "[t]he irreparable injury flows 'both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values.'" *Id.* (citation omitted); *see also Standard & Poors Corp. v. Commodity Exch., Inc.,* 683 F.2d 704, 708 (2d Cir.1982) (noting that "[i]n the preliminary injunction context [of a trademark action], a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm"). This Court concludes that, because Plaintiff has established a likelihood of confusion, Plaintiff has also satisfied a showing of irreparable harm.

■ Defendant argues that Plaintiff's delay in seeking an injunction weighs against a finding of irreparable harm. "Significant delay in applying for injunctive relief in a trademark case tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction for trademark infringement." *Blockbuster,* 869 F.Supp. at 516 (internal quotation marks and citation omitted). The Court finds, however, that Plaintiff did not delay unreasonably in filing this suit and seeking injunctive relief. Plaintiff has adduced evidence that it did not learn of Defendant's "MrPolk.com" website until April 18, 2002. (*See* Pl. Reply, Ex. A.) Plaintiff retained counsel in May, 2002, drafted the pleadings for this case in June, 2002, and contacted Defendant in an attempt to resolve the matter in early July, 2002, before filing the complaint and motion for injunctive relief on July 23, 2002. (*See* Pl. Reply at 1, Ex. B.) Plaintiff's three month delay in bringing this action is not unreasonable.

*See Avent Am., Inc. v. Playtex Prods., Inc.,* 68 F.Supp.2d 920, 933 (N.D.Ill.1999) (finding that plaintiff did not delay where plaintiff discovered infringing activity in February 1998, filed suit on April 30, 1998 and motion for preliminary injunction on May 5, 1998; noting that plaintiff's attempt to resolve the matter prior to filing suit was "commendable").

### 3. Whether Issuance of the Injunction Would Cause Substantial Harm to Others

■ The potential for harm to Defendant and third parties through the issuance of an injunction is outweighed by the potential for irreparable harm to Plaintiff. Defendant asserts that its customers would suffer if the Court were to enjoin Defendant from using the "1–800–ASK–POLK" telephone number and the "Customer.Service@MrPolk.com" email address. Although an injunction likely will result in some temporary inconvenience to Defendant and its customers, Plaintiff's interest in preserving its rights in its mark outweighs this potential for harm.

Moreover, the Court notes that Defendant's rights in the mark "Polk City Directory" will be unaffected by the issuance of an injunction. Thus, an injunction will not prevent Defendant from operating the city directories portion of its business. Rather, the injunction will merely prevent Defendant from marketing this aspect of its business in a way that infringes the "Polk" mark. Finally, as outlined below, the Court shall grant Defendant a reasonable period of time in order to comply with the injunction, which should minimize the potential for harm to third parties.

### 4. Whether the Public Interest Would be Served by Issuance of the Injunction

■ The public interest is served by protecting a trademark holder's interest in

its mark and by preventing consumer confusion. *See Blockbuster,* 869 F.Supp. at 516; *PACCAR,* 115 F.Supp.2d at 780. Accordingly, the Court finds that an injunction in this case serves the public interest.

### 5. BOND

Rule 65 of the Federal Rules of Civil Procedure states:

> No restraining order or *preliminary injunction* shall issue *except upon the giving of security by the applicant,* in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c) (emphasis added). Whether to require the applicant to provide security pursuant to Rule 65(c) is a matter within the discretion of the district court. *Urbain v. Knapp Bros. Mfg. Co.,* 217 F.2d 810, 816–17 (6th Cir.1954).

Neither party has addressed whether Plaintiff should be required to post security upon the issuance of an injunction. As indicated above, the Court will grant Plaintiff's motion for preliminary injunction. However, without further input from the parties, the Court is not in a position to determine whether Plaintiff should be required to post security, and if so, in what amount. The Court shall therefore require the parties to submit supplemental briefs addressing the matter of appropriate security and shall stay its order pending an expedited resolution of this matter.

### III. CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Plaintiff's motion for preliminary injunction [docket entry 2] is **GRANTED.**

**IT IS FURTHER ORDERED** that the Court's order granting a preliminary injunction is **STAYED** until the Court resolves the issue of security pursuant to Rule 65(c).

**IT IS FURTHER ORDERED** that, within seven (7) days of entry of this order, Plaintiff shall file a brief not in excess of fourteen (14) pages addressing whether Plaintiff should be required to post security pursuant to Federal Rule of Civil Procedure 65(c), and if so, in what amount.

**IT IS FURTHER ORDERED** that, within seven (7) days of service of Plaintiff's brief, Defendant shall file a response brief not in excess of fourteen (14) pages addressing whether Plaintiff should be required to post security pursuant to Federal Rule of Civil Procedure 65(c), and if so, in what amount.

**IT IS FURTHER ORDERED** that, *within thirty (30) days of the Court's order resolving the issue of security pursuant to Rule 65(c),* Defendant *info* USA, Inc., its shareholders, employees, agents, attorneys, officers, directors, assigns, and other persons acting at its direction or supervision or acting in concert with Defendant, are **HEREBY PRELIMINARILY ENJOINED** until further notice of this Court from:

(1) utilizing, displaying or otherwise exploiting the trademark "Polk," U.S. Trademark Registration No. 1,725,191, except as part of the mark "Polk City Directory," U.S. Trademark Registration No. 2,203,474;

(2) utilizing the domain name "MrPolk.com";

(3) utilizing email address "Customer.Service@MrPolk.com";

(4) utilizing the telephone number "1–800–ASK–POLK";

(5) utilizing the following terms or names in the marketing of its products: (a) "MrPolk.com"; (b) Customer.Service@MrPolk.com; (c) "1–800–ASK–POLK"; and (d) "Polk Directories"

(5) utilizing a logo that in is in any way similar to Plaintiff's logo, including a log that displays the word "Polk" substantially larger, separate, or apart from the words "City Directory" or "City Directories"

**SO ORDERED.**